# HENRY RECK'S EXECUTOR *vs.* CHARLES F. RECK.

*Bill to Vacate Deed for Fraud and Undue Influence—Evidence—Confidential Relations—Testimony Taken After Abatement of Suit by Death of Plaintiff and Before Revivor Not Admissible.*

A bill in equity alleged that the plaintiff, when seventy-five years old, was induced to execute a deed conveying property to his son, the defendant, by means of the latter's representations that the property was in danger of being seized by pretended creditors, and the son's promise to reconvey the property upon demand; that the representation as to creditors was false, and that no consideration was paid for the deed. The bill prayed that the deed be declared null and void and a reconveyance ordered. *Held,* that the plaintiff is not disentitled to relief on the ground that he made the conveyance for the purpose of defrauding his creditors, and is *in pari delicto* with the defendant, but that the act of the plaintiff so alleged to have been fraudulent was not his voluntary act, but was induced by the fraud and undue influence of the defendant.

Upon a bill to annul a conveyance because obtained by the defendant's fraud and undue influence, the evidence examined and held to establish the truth of the allegations of the bill and to entitle the plaintiff to relief.

When an aged man makes a voluntary conveyance of property to his son, in whom he reposed trust and confidence, the burden of showing the fairness of the transaction and that the confidence was not abused is cast upon the grantee when the grantor seeks to annul the transfer.

An equity proceeding is abated by the death of the plaintiff, and no testimony can be taken in the cause thereafter until another party plaintiff is made.

*Decided May 20th, 1909.*

Appeal from the Circuit Court for Carroll County (FOR-SYTHE, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, WORTHINGTON and HENRY, JJ.

*David N. Henning* and *Edward O. Weant* (with whom was *Wm. T. Roberts* on the brief), for the appellant.

*Charles O. Clemson* and *Benjamin F. Crouse,* for the appellee.

PEARCE, J., delivered the opinion of the Court.

The bill in this case was filed October 4th, 1907, by Henry Reck against his son, Chas. F. Reck, in the Circuit Court for Carroll County. It alleges that the plaintiff on April 12th, 1897, was seised of a tract of land in Carroll County mentioned in the bill and described in a deed filed therewith, as containing twenty-three acres and three perches, more or less. It then charges that Charles F. Reck, using his influence on the plaintiff, who was then seventy-five years of age, and intending thereby to obtain the plaintiff's said property for himself, represented to the plaintiff that said property was in danger of being seised and executed upon by pretended creditors of the plaintiff, and that he would be thus subjected to litigation and costs, and so induced the plaintiff to execute to said Charles F. Reck, on April 12th, 1897, a deed for said tract of land described as above stated, upon the agreement between them that said Charles F. Reck would, on demand, reconvey said property to the plaintiff, provided he had not been required to apply the same to the payment of any debt of the plaintiff existing on the date of said deed; that said land was not then or since subject to the payment of any claim against the plaintiff, and that said Charles F. Reck was not required to pay and did not pay any money whatever for the plaintiff, and that the representations so made by said

Charles F. Reck as the inducement for said conveyance to him were wholly false and without foundation, and solely made for the purpose of obtaining the said property of the plaintiff; that the consideration expressed in said conveyance was utterly false, and no money was ever paid or promised to be paid for said property, nor was anything of any value ever paid or promised therefor; that he always retained the control and possession of said property until about three months before filing this bill, when the infirmities of old age compelled him to remove to Baltimore, being then eighty-five years of age; that he had frequently demanded a reconveyance of the property, which was always refused, though at one time said Charles F. Reck delivered to him the original conveyance above mentioned, pretending that it operated as a reconveyance, but still refusing to make a proper conveyance of the legal title; and that he had at that date advertised said property in his own name to be sold on October 5th, 1907; that said property was the plaintiff's sole means of support, said Charles F. Reck having, without right or authority, caused all the plaintiff's personal property to be sold and disposed of.

The prayer of the bill was (1) that the said conveyance be declared null and void and be set aside; (2) that Charles F. Reck be required to execute a proper reconveyance of said property to the plaintiff, or in lieu thereof that a trustee be appointed to take charge of and sell the same for the benefit of the plaintiff, and in the meantime to hold the same subject to the final decision of the Court in the premises; and (3) that said Charles F. Reck be enjoined from selling or controlling said property, or exercising any acts of ownership or authority over the same.

An injunction was issued accordingly on the same day, with the usual leave to move for a dissolution upon filing an answer. On November 1st, 1907, Chas. F. Reck demurred to the whole bill, insisting that it appears from the face of the bill that the plaintiff executed the conveyance for the purpose of defrauding his creditors, and that he is consequently not

entitled to relief in equity. Upon a hearing on the demurrer
it was overruled by Judge Thomas, who held that upon the
allegations of the bill, admitted by the demurrer, "the case
presented was not one of conspiracy on the part of the father
and son to defraud the creditors of the former, but of fraud
and imposition on the part of the son, whereby he acquired,
without any consideration, the property of the father; that
the act of the plaintiff which the defendant contended was
fraudulent and disentitled him to relief was not his free and
voluntary act, but was induced by the fraud, undue influence
and imposition practiced upon him by the defendant, and
they cannot therefore be said to be *in pari delicto*, in which
case the party imposed upon will be relieved in equity;" in
support of which there was cited *Roman* v. *Mali,* 42 Md. 513;
*Brown* v. *Reilly,* 72 Md. 489, and *Highberger* v. *Stiffler,* 21
Md. 338.

This demurrer was overruled February 8, 1908, and no
appeal was taken from that ruling. Consequently it cannot
be reviewed in this Court. *Chappell* v. *Funk,* 57 Md. 465;
*Hyattsville* v. *Smith,* 105 Md. 321. But if it could be re-
viewed, we should not hesitate to affirm the ruling for the
reasons stated in the opinion filed in the Circuit Court.

While this demurrer was pending the plaintiff filed a peti-
tion in the cause, alleging that he and his brother, Chas. F.
Reck, were the only persons in any event interested in the
property; that neither of them were able, even if authorized,
to give personal attention to the property, which was produc-
ing no revenue, and that it would be to the advantage of both
that a trustee should be appointed to sell the same, and hold
the proceeds subject to the order of the Court upon determina-
tion of this suit. Chas. F. Reck answered this petition, ad-
mitting all its allegations and consenting to such sale, and
on February 13th, 1908, D. N. Henning and Charles O.
Clemson were by an order or decree of Court appointed trus-
tees to make such sale, the proceeds to be held subject to the
further order of the Court, but it does not appear that the
trustees have made any sale.

On March 5th, 1908, Chas. F. Reck answered the plaintiff's bill, denying all the allegations of fraud, or of the exercise of undue influence in obtaining said conveyance from his father, and denying any agreement or understanding with his father for the reconveyance thereof to him upon any contingency whatever. He averred that his father was indebted to him at the time of the execution of the conveyance to an amount equal to the consideration named in said deed, viz, $1,000, and that this consideration was true and *bona fide*. He admitted that his father continued to reside on the property and to control and use the proceeds as his own until September, 1907, but alleged that this was by his permission and that he paid all taxes on the property since the execution of the deed. He denied that he ever surrendered said deed to the plaintiff or reconveyed or pretended to reconvey the property to him, and alleged that the plaintiff took possession of the deed without his consent and after he had recorded it in good faith, and also denied that he had sold the plaintiff's personal property or had received and retained the proceeds of any sale thereof, and alleged that the proceeds were paid to plaintiff's wife, his step-mother, since deceased.

Issue being joined, the plaintiff proceeded to take testimony to support the allegations of his bill, he being the first witness sworn. We were informed at the argument that the sole purpose of producing him as a witness was to show his utter mental incompetency, and his testimony abundantly demonstrates that at the time it was taken, he was hopelessly incompetent. He could give no intelligible account of the transaction which led to the conveyance or of any question asked him. He said he signed the deed, but did not know why he did so; that he owed Chas. F. Reck nothing at that time that he knew of, and never received anything for the deed that he knew of, and he did not know anything that was said at the time. He could not remember that he had ever been in Franklin Square Hospital though he was there some time in September, 1907, nor that he had even been at Bay View Asylum, though he had been there several months just

before testifying, and was brought from that place the day before he testified, for that purpose. He thought he was then living at Union Bridge, in Carroll County, and that he was working there without wages for a man whose name he did not know.

The only value of his testimony, or more accurately, his examination, was to show that he was incapable mentally of testifying. The requisite proof therefore to sustain the bill must be found, it at all, elsewhere.

James C. Reck, another son of the old man who lived in Baltimore testified that his father was eighty-six years of age at that time; that in July, 1907, he fell in the hay mow on that farm and dislocated his hip, and that he then went to the Franklin Square Hospital in Baltimore where he remained eleven weeks—that witness then took him to witness' house in Baltimore, where he remained three months and then was sent to Bay View Asylum—where he had been ever since except the day he testified at Highlandtown, in Baltimore County, and that he had never been at Union Bridge since July, 1907; that when he first came to the hospital at Franklin Square and until a short time before he left witness' house, his mind seemed all right, but afterwards gave way, as shown in his examination; that his father had $26.50 when he went to the hospital, which he handed witness, and which with $55.00 supplied by witness and $80 paid him by Chas. F. Reck from sale of horse and cow was all used for his father's benefit at the hospital; that he was sent to Bay View after he had been three months at witness' house, because witness' wife could not manage him, and witness could not leave his employment and stay at home to attend to him. He also testified to a conversation he had with Chas. F. Reck in May five years previously, at witness' house in Baltimore. when he came there to see a doctor; he said: "My brother, Chas. F. Reck, told us my father was on a note as security for Henry Null; that he thought my father would have it to pay and that he persuaded my father to transfer the farm to him, and that he would get him off the note, and afterwards

would transfer the place back to him. He told me he had done this to save him paying the note; then he told me that after he had got him off that he had returned the place back to my father; that it had not cost him anything; that he hadn't anything in the place and everything was all right between him and pap; and that my father did not owe him anything at the time the deed was made."

On cross-examination he testified that in the fall of 1907, Chas. F. Reck told him at Snouffer's livery stable that if he (witness) would give him what he had in the place, he would turn it over to him, and said he had $1200. in the place, but witness told him he had not 1200 cents in it.

He also testified that when his father was in the hospital he told him to take charge of his deeds which were in a bureau drawer at Union Bridge, and he went there and got them, and that the deed then shown him from his father to Chas. F. Reck filed as Exhibit 1 with the bill, was one of the deeds he took from that bureau drawer. Catherine S. Reck, wife of James C. Reck, was present at the conversation testified to by him at their house in Baltimore and confirmed his testimony as to the statement made by Chas. F. Reck.

Jeremiah Reck, an uncle of Chas. F. Reck, testified that about four years before that time he had a conversation with Chas. F. Reck about the matter, and then asked him if he had ever deeded the farm back to his father, and he said he had, but that his "father had failed to have the deed recorded and he can't do it no more and I intend to leave it that way while he lives, and then I intend to settle it up straight, unless his wife comes in for more than she ought to have, then I will stop her. He told me the property was his father's."

Wilson L. Crouse testified that he had been tax collector for nine years in that district and knew the farm in question. He said that Henry Reck paid him the taxes on that farm for all except the last two years, and he identified receipts given by him for these payments. He also said Chas. F. Reck paid the taxes for the last two years, and that the prop-

erty was assessed to Chas. F. Reck on witness' tax book for 1907.

Hezekiah Baker testified that he had known both parties for fifty years; that about twenty-five years before, Henry Reck owed Chas. F. Reck a note of $75 for guardian money due him. Henry asked his son if he needed the money. He replied: "I don't just need it, but I can make——. Then Henry counted down and gave the $75.00 to Charles and Charles said: I can't just put my hand on the note but I will give it to you some other time. After that Charles brought suit against Henry, who would not pay the note because he had paid it before. Charles had counted interest on the note for about $300."

Henry T. Null testified that he was a brother-in-law of Henry Reck who was security for him on a note of $250 to Miriam Albaugh. He said: "Henry Reck notified me to have him released which was eight or ten years ago. Then I gave my own individual note to Mrs. Albaugh and took up the note on which Reck was security and left it at Silas Senseney's store for Henry Reck. He was only on one note for me." This was the testimony in chief for the plaintiff, which was concluded June 8th, 1908.

Henry Reck died June 30th, 1908, leaving a will by which James C. Reck was appointed executor, to whom letters testamentary were granted, and on July 22nd, 1908, he was made party plaintiff in the place of the deceased, the defendant, through his counsel, agreeing to the order of Court for that purpose. The defendant, Chas. F. Reck, testified in his own behalf, and Frank T. Shriver, John W. Davis, John C. Boone, Samuel L. Johnson, Samuel F. Koontz and Chas. F. Myer also testified in his behalf, and these were the only witnesses for the defense. The plaintiff, in rebuttal, produced Mr. David N. Henning as a witness on July 27th, 1908, and he testified that a short time before the bill was filed in the fall of 1907, Chas. F. Reck came to his law office at his request. He said: "I asked him whether he paid—I either used the word *paid* or *gave*—his father anything for the

property of which he had the deed, meaning the deed for the property mentioned in this case, at the time the deed was executed. He said he did not give or pay his father anything for the property when he obtained the deed, but since that time he had, at various times let his father have money. I then asked him how much money he let his father have, and he said he didn't know. I asked him if he would not make a statement or some kind of an account to show what these amounts were which he said his father had gotten and return the deed to his father. I said I thought we could make a setttlement if his father owed him anything; it could be paid and he could return his father's property, which he declined to do, and I then filed the bill in the case."

The plaintiff excepted to all the testimony in behalf of the defendant because at the time each of these witnesses testified, Henry Reck had died and no one had been made a party to the suit in his stead to prosecute the same; and the Circuit Court sustained these exceptions and struck out all the testimony, for the defendant. There can be no question that this action was correct. In such case "it is necessary that the person to whom the interest of the deceased party is transmitted should be before the Court, and until he is made a party, the suit, though not *absolutely* abated, is deemed defective." 2 *Daniel's Ch. Pr.,* star page 1507. "Where the suit was originally perfect, such an event subsequently happening causes what is technically called an abatement, that is to say, puts the suit in such a condition that no further proceedings can be taken until the defect is remedied." *Idem,* star page 1506. "All further proceedings must be suspended until the suit is renewed against or in favor of the person succeeding to the interest of the deceased, *except* when the cause has been set down for hearing." *Alex. Ch. Pr.,* 101. "Abatement signifies a present suspension of all proceedings in a suit for the want of proper parties capable of proceeding therein." *Miller's Eq.,* 251; *Glenn* v. *Clapp,* 11 G. & J. 1; *Whelan* v. *Cook,* 29 Md. 1.

The case was thus left to the Court upon the testimony for the plaintiff alone, and the learned Judge, being of opinion that this testimony did not sufficiently sustain the allegations of the bill, he dismissed the bill with costs to the defendant.

In this view however we are not able to concur. The Court below seemed to rely upon the case of *The Wenstrom Co.* v. *Purnell,* 75 Md. 113, in which this Court held that "the onus of proof is upon the plaintiff who seeks to set aside a contract executed or partly executed, to establish the alleged fraud by clear and indubitable proof; * * * and that relief will only be granted in those cases where it plainly appears that the misrepresentation or undue suppression of material facts actually occasioned and brought into existence the contract."

In that case the bill was filed by Purnell against The Wenstrom Co. and E. L. Tunis to rescind a contract of subscription to the capital stock of the Co. JUDGE ALVEY said: "There were but two witnesses to the transaction involved— the plaintiff and Tunis. The former testified in his own behalf, and Tunis for the defendants, and there is a sharp conflict in the testimony of these two witnesses as to the main facts of the alleged misrepresentation. * * * It is a well settled principle in Courts of equity, and especially on allegations of fraud, that if the allegations of the bill are supported *only* by the testimony of a single witness, and his testimony is positively and precisely denied by the defendant on oath, or a witness in his behalf, the bill will be dismissed unless there be corroborative evidence from letters or other documents in the case." But the situation in the case before us is a very different one. The material allegations here are that Charles F. Reck falsely represented to his father, then nearly eighty years of age, that his property was in danger of seizure by reason of his suretyship for Henry Null, and that by this means, and his promise to secure a release, and then to return the property for which he paid nothing, and gave no consideration, he procured the deed in question. The evidence of the father is worthless for any purpose except to

demonstrate his absolute imbecility at the time it was offered, and his production as a witness, was at once the readiest and most effective method of demonstration; and the evidence of Chas. F. Reck and of all his witnesses was eliminated by the ruling of the Court which we have approved as correct. But the testimony of James C. Reck and Catherine S. Reck, two unimpeached and uncontradicted witnesses, remains, and this clearly and unequivocally proves by Chas. F. Reck's own statement that he did procure the deed by the means charged, and the testimony of Henry T. Null abundantly proves that there was no danger from the suretyship on his note, and that the representation of danger was a false representation. It shows that Chas. F. Reck made no attempt to secure a release from this note; that the demand came from Henry Reck alone, and that when made, Null instantly went to Mrs. Albaugh, who immediately accepted Null's unsecured note, and surrendered the note on which Henry was security. No more artful and effective means could have been used to get possession of the property of this old man, nearly eighty years of age, than to excite his fear of its loss by reason of that suretyship then existing. While the answer of Charles F. Reck is not evidence in his favor, and his denial therein of the fraud charged in the bill cannot avail him his statement of fact in the answer may be compared with the statement of witnesses as to the same facts, and when this is done the truthfulness and honesty of Charles F. Reck will be sadly discredited. He is flatly contradicted by James C. Reck and his wife, both of whom swear that he admitted to them that he procured the deed upon the representations and the promise charged in the bill, and also that he said he had returned the property to his father; and upon the last point he is also contradicted by Jeremiah Reck, who is an absolutely disinterested witness. The testimony of Henry T. Null conclusively shows that Henry Reck's property was never in danger of seizure by reason of that note, and that the representation of such danger and the pretended purpose to secure a release, were false and fraudulent, and there is no evidence

of any other suretyship which could create such danger. He is contradicted by Wilson L. Crouse the tax collector who proves that the taxes which Chas. F. Reck claims were paid by him—were all paid by Henry Reck, except the last two years.

He is further contradicted by Mr. Henning, who testified that he admitted to him that his father was not indebted to him at all at the time of the execution of the deed, and that he then paid or gave nothing to his father, as he had claimed in his answer he had done, and though he then claimed that he had since at various times let him have money, he refused to say how much, and said he did not know how much. Finally, his inherent dishonesty in a previous transaction with his father was demonstrated by the testimony of Hezekiah Baker in his narration of the attempt to collect by suit the amount of a note long before paid by his father in the presence of Baker upon the son's promise to deliver up the note; and it may here be noted that in his evidence, which was excluded, he did not attempt to deny or explain his conduct.

In view of all these contradictions and discrediting facts, we should reach the same conclusion which we now reach if all the excluded testimony was before us for consideration.

We have already said that the parties in this case cannot be regarded as *in pari delicto,* and that relief cannot be refused on that ground. In *Central Bank* v. *Copeland,* 18 Md. 317, the Court said: "A contract, the execution of which is induced by fraud, is void. * * * Artifice and force differ only as modes of obtaining the assent of a contracting party."

In *Cherbonnier* v. *Evitts,* 56 Md. 294, it was said: "It is not inconsistent with the exercise of undue influence or artifice that the instrument assailed was executed voluntarily, and with a knowledge of its contents."

In *Berger* v. *Bullock,* 85 Md. 441, a widow with a small property was induced by threats of a contest of the will under which she held the property and by false statements made by her son to execute a deed conveying all her property to her daughter and son-in-law. On a bill to annul this deed the

lower Court refused the relief, but on appeal that decree was reversed, JUDGE McSHERRY saying: "Whilst Courts ought to be slow in setting aside at the instance of a grantor a conveyance seemingly made with deliberation, they would fall far short of their plain duty if they failed to rip up and annul an instrument executed by a person whose intention to make it has been brought about by such fraud and deception as this record discloses." And his language may be properly applied to this case.

In *Highberger* v. *Stiffler,* 21 Md. 352, the Court said: "Wherever a fiduciary relation exists, *legal or actual,* whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of equity independent of the ingredients of positive fraud, through public policy, as a protection against overweening confidence, will interpose to prevent a man from stripping himself of his property. The relation requires the parties to abstain from all selfish projects. The general principle is, if a confidence is reposed and that confidence is abused Courts of equity will grant relief. One of the most familiar examples is that of parent and child. All contracts and conveyances whereby benefits are secured by children to their parents are objects of jealousy, and if they are not entered into with scrupulous good faith and are not reasonable under the circumstances, they will be set aside, unless third persons have acquired an interest under them, especially where the original purposes for which they have been obtained are perverted or used as a cover. * * * The natural relation of the parties was reversed in this case by the influence of time. The parent had become a child, and the child guardian to the parent." In such cases it is held not necessary to prove the actual exercise of overweening influence, misrepresentation or fraud, *aliunde* the act complained of. The burden of establishing its perfect fairness is thrown upon the grantee or beneficiary in the transaction.

The wisdom of the policy above mentioned which will not permit one in the position of this old man to strip himself of

his property has a striking illustration in the fact that the son who acquired his property by the means stated permitted his father to die in an almshouse and did not attend his funeral, though it was in his own town. In view of the facts disclosed in the record and of the principles announced in the cases we have cited, the conveyance in question must be annulled and set aside. We must therefore reverse the decree dismissing the bill, and remand the cause that a new decree may be passed in conformity with this opinion.

> *Decree reversed, with costs above and below, and cause remanded.*