TIMOTHY EDGAR HENRY, An Infant, by James D. Henry, His Father and Next Friend,

*vs.*

ELLA LEECH and MICHAEL J. LEECH, Her Husband.

*Fiduciary relations: setting deeds aside; burden of proof; exceptions; deed or gift from parents. Mental capacity: mere eccentricity.*

Whenever a fiduciary relation exists, legal or actual, whereby trust and confidence are reposed on one side, and influence and control are exercised on the other, courts of equity, independent of the ingredients of positive fraud, will interpose to prevent a man from stripping himself of his property.  p. 439

In such cases, it is not necessary to prove actual exercise of overweaning influence, misrepresentation, or fraud *aliunde* the act complained of; the general rule is, that he who bargains in a matter of advantage with a person placing a confidence in him, is bound to show that a reasonable use has been made of that confidence.  p. 439

A gift from a child to a parent is *prima facie* void, because a child is presumed to be under the control of parental influence, so long as the dominion of the parent lasts, and while that dominion exists, the burden of proof lies on the parent maintaining the gift to disprove the exercise of parental influence by proof that the child had independent advice or by other proof.  p. 440

But a voluntary conveyance of property from a parent to a child is not *prima facie* void unless, by competent proof, the reversed relation of the parties is shown to exist.    pp.440-441

In such a case if it is shown that confidence is reposed by the parent, with resulting superiority and influence on the part of the child over the parent, the rule should be applied.    p. 441

*Ubi eadem ratio, ibi idem jus.*                              p. 441

But the existence of a relation between parent and child such as might naturally occur from mere kinship and affection does not of itself imply dominion and control by the child over the property or person of the donor.                    p. 442

Evidence of mere eccentricity in a person advanced in years is not sufficient of itself to warrant the presumption of lack of mental qualifications, when opposed to direct and positive evidence of disinterested witnesses as to the party's mental capacity.                                          p. 442

*Decided June 24th, 1914.*

Appeal from Circuit Court No. 2 of Baltimore City. (BOND, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Daniel S. Sullivan* (with whom was *Charles Pielert* on the brief), for the appellant.

*Armstrong Thomas* and *J. Purdon Wright,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

The appellant, the plaintiff below, an infant, by his father and next friend, filed his bill in Circuit Court No. 2 of Bal-

timore City seeking to annul and set aside a gift made by his grandfather, John Welsh, unto his aunt, Ella Leech, one of the appellees.

The bill alleges, in substance, that the said Welsh departed this life on or about the 19th day of April, 1913, at or about the age of eighty-two years leaving the said Ella Leech, a daughter, and the plaintiff, a son of a deceased daughter, as his next of kin and only heirs-at-law. "That by reason of his great age and physical infirmities, the mind and will of the said Welsh at the time of his death and for a considerable period prior thereto were so weak as to render him incapable of conducting any business with any rational comprehension of his acts." And that on or about the 29th day of November, 1912, the defendant, Ella Leech, by means of artifice and undue influence exercised by her over the said John Welsh when his mind and will was weakened by sickness and infirmity and old age, did induce him to assign or transfer to her the sum of thirty-three hundred and seventy-seven dollars ($3,377.00) then on deposit in The Savings Bank of Baltimore.

The prayer of the bill asks that the Court assume jurisdiction of this fund and that it be disbursed or distributed to those entitled thereto and that the defendants account for any sum or sums withdrawn from said fund and used by them; and that they be restrained and enjoined from disposing of, or in anywise interfering with, said fund or any part of it.

The defendants answered the bill denying the alleged impaired condition of the mind and will of John Welsh and also denying the exercise of any artifice or undue influence practised upon him by the said defendant, Ella Leech, inducing him to assign or transfer to her the money so deposited by him in said bank, and averring therein that said gift was made to her voluntarily of his own free will, acting with and in the possession of his full mental powers.

The Court, after hearing evidence, dismissed the bill and dissolved the preliminary injunction which had been granted upon the filing of the bill. It is from this order or decree of the Court dismissing the bill and dissolving the injunction that the appeal is taken.

Before considering the evidence here offered we should determine whether this case falls within the doctrine of confidential relations where the burden of proof is upon the grantee to establish to the satisfaction of the Court the perfect fairness of the transaction.

The rule is designed, in some degree, as a protection to the parties against the effects of overweaning confidence. 1 *Story Eq. Jur.* 307.

As was said in *Highberger* v. *Stiffler,* 21 Md. 353: "Wherever a fiduciary relation exists, legal or actual, whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of Equity, independent of the ingredients of positive fraud, through public policy as a protection against overweaning confidence, will interpose to prevent a man from stripping himself of his property. *Story's Eq.,* secs. 303-322.

"The relation requires the parties to abstain from all selfish projects. 'The general principle is, if a confidence is reposed and that confidence is abused, Courts of Equity will grant relief.'

"In such cases it is not necessary to prove actual exercise of overweaning influence, misrepresentation, importunity or fraud *aliunde* the act complained of * * *. The general rule is that he who bargains in a matter of advantage with a person placing a confidence in him, is bound to show that a reasonable use has been made of that confidence,—a rule applying equally to all persons standing in confidential relations with each other. *Story's Eq.,* sec. 312."

*Colegate D. Owings' Case,* 1 Bland. 392; *Brooke* v. *Berry,* 2 Gill. 99; *Todd* v. *Grove,* 33 Md. 188; *Eakle* v. *Reynolds,* 54 Md. 305; *Williams* v. *Williams,* 63 Md. 371; *Whitridge*

v. *Whitridge,* 76 Md. 54; *Zimmerman* v. *Bitner,* 79 Md. 115; *Bauer* v. *Bauer,* 82 Md. 241; *Berger* v. *Bullock,* 85 Md. 441; *Brown* v. *Mercantile Trust Co.,* 87 Md. 377; *Reck's Executor* v. *Reck,* 110 Md. 497; *Thiede* v. *Startzman,* 113 Md. 278; *Kensett* v. *S. D. & Trust Co.,* 116 Md. 526; *Beinbrink* v. *Fox,* 121 Md. 102.

But it is sometimes difficult to lay down with precision what is meant by the expression "confidential relations" or "relations in which dominion may be exercised by one person over another." *Cooke* v. *Lamotte,* 15 Beav. 239, cited in *Whitridge* v. *Whitridge,* 76 Md. 73. Such a relation will undoubtedly be presumed in certain cases; as for instance, in that of a guardian and ward, parent and child, attorney and client, and also in that of principal and agent, and may exist in many other situations. *Brown* v. *Mercantile Trust Co., supra,* and other cases above cited. This Court in the case of *Bauer* v. *Bauer,* 82 Md. 242, speaking through Judge Briscoe, said: "It is a well settled law that a gift of voluntary conveyance between parties standing in the confidential relation of child to parent is *prima facie* void, and can only be upheld upon proof that it was the free, voluntary and unbiased act of the person making it. *Whitridge* v. *Whitridge,* 76 Md. 54. This is so because a child is presumed to be under the control of parental influence, as long as the dominion of the parent lasts and whilst that dominion exists it lies on the parent maintaining the gift to disprove the exercise of parental influence, by proof that the child had independent advice or in some other way.

"But a voluntary conveyance of property from a parent to a child rests upon a different principle and is not *prima facie* void. It turns, says Mr. Pomeroy in his work upon *Equity Jurisprudence,* upon the exercise of actual undue influence and not upon any presumption of invalidity. A gift from parent to child is certainly not presumed to be invalid. 2 *Pomeroy Eq.,* sec. 1399. If, however, the confidential relation is shown by competent proof to exist, then the burden

is imposed upon the grantee to show that the transaction was a righteous one."

In the case of *Highberger* v. *Stiffler, supra,* the mother, who was advanced in years, had entrusted to her son the conduct of all her business, and it was there held that "the natural relation of the parties was reversed by the influence of time, 'the parent had become a child, and the child was a guardian to the parent.' The same dependence, overweaning confidence and explicit acquiescence which rendered one an automaton in the hands of the other existed, '*et ubi eadem ratio, ibi idem jus.*' The wish of the agent had become the will of the principal, whatever the former suggested the latter executed. There was no consent to two minds, but a merger of the principal's mind into the agent's."

In a case of a voluntary gift by the parent to a child, like the one before us, the reversed relations of the parties must first be shown to exist before the rule can be applied and before the gift can be presumed to be void. In all such cases where it is shown that a confidential relation exists as a fact,—where confidence is reposed on the one side and the resulting superiority and influence on the other,—the rule should be applied. *Zimmerman* v. *Bitner,* 79 Md. 126. In the case before us the relation existing between the parent and child is not that confidential relation upon which the rule is based. Until a few days prior to the time when the gift was made the father and daughter had been separated for a number of years with practically no intercourse between them and no outward indication of the existence of any close or intimate relation that might naturally have been expected between parent and child.

The evidence does not disclose a single instance where the business affairs of the father were entrusted or confided to the management of the daughter. He had looked after and managed his own affairs. He had sold his farm and had deposited the money received therefor in bank, of which fact the daughter was entirely ignorant. There is nothing

in the evidence from which we can reach the conclusion that there existed between the father and daughter a confidential relation such as is meant and contemplated by the rule above mentioned. There might have been, and probably was, a relation existing between them such as might naturally arise from near kinship and mutual affection. But it was not such a relation as would imply dominion or control either over the property or person of the donor.

Having determined that this case does not fall within the rule, there is no presumption that the gift was void, and thus the burden of proving that the gift was not the free, voluntary and intelligent act of the donor is upon the plaintiff. A number of witnesses produced by the plaintiff testified as to acts and expressions of the donor which the plaintiff contends show a want of mental capacity in him to make a valid gift or conveyance. Such conduct of the donor showed that he was an eccentric person, and to some extent, it may have reflected upon his mental condition, but such conduct, we think, in view of the positive and direct evidence of others who testified in support of his mental soundness, does not warrant us in concluding that the gift is void for a want of mental capacity in the donor.

There are facts and circumstances found in the record which give rise to strong suspicion of undue influence exercised upon the donor by the daughter and the lack of free, voluntary action on his part. But after carefully weighing the evidence, we think the facts of undue influence and the lack of free, voluntary action on the part of the donor are not sufficiently established to justify us in deciding that the gift is void. The donor was at the time of the gift an old man and in bad health. He had by economy, we may say parsimony, saved the money that passed to his daughter under the gift complained of, and it was all he had. It was but a few days before the gift was made that he unexpectedly called at the home of his daughter and obtained permission from her to make his home with her for the remainder of

his life. The daughter had not heard from him for months and was not aware of the fact that for weeks immediately preceding his visit to her he had been sick in the hospital. It is quite clear that the old man had at such time reached the conclusion that his days were numbered and that the end was near. The first night after entering the home of his daughter he was taken violently sick and his life was despaired of. Not only was a physician sent for, but a priest was likewise called in and the last rites of his church were administered to him. He, however, recovered from his attack and it was on the following day that the donor for the first time imparted to his daughter, the donee, his desire that she should have the money deposited in bank to his credit. The daughter testified that her father said to her: "I have come to you to spend the rest of my life and the money I have in bank I am going to turn over to you; give it to you so you can do with it what you please. Draw it out of bank, invest it as you want, but take care of me the rest of my life." On the following day arrangements were made by which the money was to be transferred from him to her and the husband remained home from his work to assist in the transfer. He went to the bank in the morning, got the form of the assignment which was to be executed by the donor, and upon being told that it was necessary for the attending physician to certify to the mental soundness of Mr. Welsh, he, after first carrying the form of the assignment to the donor, but before getting his signature thereto, called upon the physician with the paper-writing and said to him: "Doctor, the old man wants to get some money for this and you sign this, please," which he did. In signing the paper as requested, the physician not only certified to the donor's mental soundness, but also signed as a witness to the execution of the paper, and thereafter, returning with the husband, paid a professional visit to the donor. The physician testified that when he signed the paper he thought it was simply an application for sick benefits and did not know at the

time that he was certifying to the mental soundness of Mr. Welsh, but stated that had he known the contents of the paper and the purpose for which he was signing, he nevertheless would have signed it. Subsequently, on the same day, the donor signed the paper-writing transferring the money to his daughter and she with her husband in the afternoon of that day went to the bank and had the money transferred from her father's account to the joint account of herself and husband. Some days thereafter a part of this money was withdrawn and was applied by them in the purchase of the ground rent on the property owned by them and where they at the time lived. About the same time the services of an attorney were procured and an instrument of writing prepared by him which was thereafter executed by Mr. Welsh and witnessed by three persons including the attorney who prepared it. By it Mr. Welsh admitted that he had given the money to his daughter absolutely and unconditionally without any restrictions, and in it said: "I have given her this money because of my great regard and affection for her; because of the regard and affection which she has always shown to me; and because of her careful attention and faithful services to me and my household after her mother's death, and during the time which I have lived at her home during the years 1906 and 1907; and also to partially repay her for taking me in and giving a home during the remainder of my life and for her care and attention and faithful nursing during this time." It was stated by both his daughter and her husband that the execution of such a paper was suggested by the donor and that it was at his request that the lawyer was employed to prepare it. The reason assigned by Mr. Welsh for the execution of the above mentioned writing, as stated by his daughter and husband, was that she should not be disturbed in her right to such money under the gift. Little was asked the donor concerning the paper-writing at the time of its execution, although, as testified to by the witnesses to its execution, it was read

over to him, and one of them, a neighbor, Mr. Radcliffe, testified, saying: "I went up to the bed and said, now Mr. Welsh, how old are you? Eighty or eighty-one, I am not sure which. I said, this is a very important thing, do you know what you are doing? He says, I do. I says, are you giving this to your daughter of your own free will? He says, of my own free will. He said, she has been a good daughter to me and I feel it my duty to repay her." And in his cross-examination he testified that Mr. Welsh answered in a strong voice and said: "I know exactly what I am doing." The lawyer who prepared the paper and who was one of the witnesses to its execution, did not at such time, so far as the record discloses, make any inquiries to ascertain the facts elicited from the donor by Mr. Radcliffe, nor did he testify in the case, although he had, during the time of his employment, one or more conversations with Mr. Welsh and was in a position, no doubt, by reason of the information acquired at such times, to have thrown some light upon the issues here involved.

The daughter and son-in-law were the only ones present at the time the gift was made and are, therefore, the only persons who can testify as to what was said and done at such time, and the daughter in her testimony in relation thereto made a number of conflicting statements, and we are rather impressed with the views of the Court below, as expressed in its opinion, "that she was making evidence to fit what she conceived to be the needs of the case." The, haste with which the assignment was consummated and the fact that the grandson, the plaintiff, was overlooked by the grandfather in the disposition of his property and estate, although he had on several occasions not long before the gift was made, stated to others that the plaintiff with his aunt, the defendant, would upon his death be his beneficiaries, together with other facts and circumstances in the case, cast grave suspicion upon the conduct of the defendant. But this cannot be substituted for the proof required of the plaintiff that the

gift was made as the result of undue influence exercised upon the father by the daughter inducing him to make it and that it was not the free and voluntary act of the donor. The physician who visited the donor on the day the gift was made, as well as upon other days both before and after such time, and the priest who saw him either upon the day the gift was made or in the closing hours of the preceding day when he was desperately ill and from which attack he had largely recovered at the time of the gift, and who subsequently saw him on many occasions before his death a few months thereafter, both testified that his mental faculties were clear at such time. And the two witnesses to the execution of the aforesaid paper-writing confirming the gift hitherto made by the donor to his daughter, that were sworn, testified that at such time the donor's mind was clear and on that occasion he said that he "fully intended to do what he had done" and acknowledged that such gift to his daughter was his free and voluntary act. As was said in the opinion of the learned judge in the Court below: "This gift may have been unwise, carelessly made and unfair in our view. It may have resulted from an impulse which a more vigorous, or a more thoughtful man would have resisted. And, too, the defendant may have been greedy in taking advantage of the old man's impluse. All these things may be true; and yet the gift may have been made with a free will," and thus beyond the interposition of a Court of Equity.

The plaintiff in this case has not met the burden of proof imposed upon him and is not entitled to the relief sought, and therefore the decree of the Court below will be affirmed.

*Decree affirmed, with costs to the appellee.*