SILAS E. TRACEY ET AL. *v.* WILLIAM THOMAS TRACEY ET AL.
[No. 83, October Term, 1930.]

*Decided January 16th, 1931.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Parke and Sloan, JJ.

*J. Howard Murray,* with whom were *Theodore F. Brown* and *A. Earl Shipley* on the brief, for the appellants.

*H. Courtenay Jenifer* and *Thomas M. Jenifer,* for the appellees.

Offutt, J., delivered the opinion of the Court.

Cornelius G. Tracey and Sarah E. Tracey, his wife, lived for many years on a farm of about 77 or 78 acres, which Mrs. Tracey owned, and which was located on the Yeoho Road near Upperco, in Baltimore County. After the death of her husband, which occurred in 1925, Mrs. Tracey continued to reside on the farm until December 2nd, 1928, when she went to live with her daughter, Nora Mae Alban, at Hampstead in Carroll County, where she remained until her death on March 20th, 1928. While at Mrs. Alban's home, on January 28th, 1928, she executed a deed conveying her farm to Silas E., Joseph N., and Rezin Emory Tracey, Nora Mae Alban, Rachel Annie Martin, and Della O. Carr, who, with William Thomas Tracey, were her only children and are her heirs at law. On June 7th, 1929, William Thomas Tracey and Susie Tracey, his wife, filed in the Circuit Court for Baltimore County, in equity, a bill of complaint against

the six grantees named in that deed and the husbands and wives, respectively, of such of them as were married, in which they asked (1) that the deed be annulled; (2) that the property described in it be sold and the proceeds distributed under the direction of the court to such persons as might be entitled thereto; (3) that William Thomas Tracey be allowed out of the proceeds of such sale $1,384.37 or so much thereof as the court might deem fair and reasonable compensation for work done and materials provided by him for Sarah E. Tracey; (4) that Susie E. Tracey be allowed out of the proceeds of such sale $2,120 for services rendered by her to Sarah E. Tracey; (5) that the court determine the rent payable by William Thomas Tracey under a certain lease from his mother to him; (6) that the defendants be enjoined from incumbering or aliening the property or interfering with the said William Thomas Tracey in the quiet enjoyment thereof pending the suit; and (7) for general relief. The defendants filed a joint answer to the bill, testimony was taken in open court, the case was argued and submitted for decree, and on May 7th, 1930, the chancellor (1) decreed that the deed from Sarah E. Tracey to Silas E. Tracey and others was null and void, and (2) denied all other relief prayed, General Equity Rule 21, but without prejudice to the rights of the complainants to assert their claims to such relief in some other appropriate proceeding. From that decree the defendants have appealed to this court.

As outlined by their bill of complaint and in the testimony adduced by them, briefly stated, the plantiffs' contention is that, when the deed was made, Sarah E. Tracey, while not mentally incompetent, was far advanced in years, enfeebled in body and mind by disease and the infirmities of age, and partially blind; that until the autumn preceding the execution of the deed the friendliest and most affectionate relations had existed between her and William Thomas Tracey, also referred to in the evidence as Thomas or Tom, her son, but that during that autumn certain of the defendants had wrongfully induced her to believe that Thomas, hereinafter referred to as Tom, had failed to properly account for the

proceeds of certain crops which he had collected for her use, had poisoned her mind against him, and that by constant importunity and pressure, which by reason of her mental and physical weakness she was unable to resist, they had induced her to leave her home for that of her daughter, Mrs. Alban, and, while there and subject to influences hostile to him, eventually to make the deed by which Tom was excluded from any share in her estate.

On the other hand, the defendants assert that, while it was true that Mrs. Tracey did believe that Tom had abused her confidence, they did not induce that belief; that no confidential relationship existed between her and the grantees named in the deed; that the evidence was wholly insufficient to show that they exerted any undue or improper influence to procure it; but that, on the contrary, it showed that it was her free and voluntary act; and that, since it was not denied that she was at the time mentally competent to execute it, it was a valid act.

These diverse and conflicting views are based not so much upon any dispute as to the existence of the facts upon which, respectively, they are predicated, as upon a variance in the meaning which the parties, respectively, ascribe to them, for there is no substantial dispute as to their existence.

An examination of the record leaves little doubt that the execution of the deed was induced in part by a prejudice which Mrs. Tracey had conceived against Thomas, based upon her conviction that he had failed to account to her for moneys which he had collected as for her. Nor can there be any substantial doubt that several at least of the appellants fostered and fed that prejudice, and it may also be inferred that it was due to the incessant activity of three of them, Silas and Joseph Tracey and Albert Carr, that the deed was executed. But the evidence submitted by the record fails to show whether Mrs. Tracey was justified in her doubt as to the honesty of her son Thomas, nor does it directly appear that it was originally due to any suggestion of the appellants or any of them. That situation is unfortunate, because, if it had appeared that the charge was not only unfounded, but

had been first made by the appellants or some of them, it would go far towards supporting the charge that the deed was the result of fraud or undue influence, while, if it was true in fact that Thomas had betrayed the trust which his mother had reposed in him, and that she had learned of that through her own inquiries, it would remove much of the suspicion that attaches to the deed from her to six of her children. Thomas acted as his mother's agent and stood in a confidential relation to her, and, if and when it appeared that he had collected moneys for her, the burden was upon him to satisfactorily account to her for their disbursement, and in this case he was probably the only person who could have done that satisfactorily. But neither he nor any other party to the suit was allowed to testify to any conversation or transaction had with the deceased, and, while in view of the varied relief sought by the bill, those rulings were correct, yet the result was to exclude the testimony of the only witness likely to have any knowledge on the subject as to one of the most important issues in the case. But, taking the record as we find it, some facts do emerge with reasonable certainty from the evidence, which may be thus stated:

On the 10th or 15th of August, 1928, Mrs. Tracey, accompanied by her daughter, Mrs. Alban, appeared at the First National Bank of Hampstead, and by inquiry ascertained from its officials the state of her account with that bank. The only direct explanation of her reason for that visit to the bank was a statement of one of the witnesses that she had told him that she went "to find out about her bank account and she found that there had not been any money deposited there for quite a while, and she thought that, she said, she thought it had been." Although it is not directly so stated, it may be inferred from the evidence that she wanted to ascertain whether Tom had deposited to her account the proceeds of a sale of certain wheat grown on the farm which he had made for her account. She found that no such deposit had been made, and while it does not appear that she made any comment at the time or that it affected

her relations with him then, something over three months later she stated that Tom had "robbed her."

On November 24th, 1928, a conference of her children was called at her home, apparently to hear Thomas account for money which he had collected for her, and she requested Samuel A. Brooks, sheriff of Baltimore County, to attend that conference, telling him "that Mr. Tom Tracey had robbed her, and said she wanted Tom to explain before the rest of her children where this money had gone, this was money of Vernon's this last crop." Tom requested Grant Mays, a friend and neighbor, to be present at the same conference, and at the conference Tom appeared with his checks and his accounts, which Brooks and Mays attempted to explain to Mrs. Tracey, but no witness present attempted to say what the checks or accounts proved, or what explanation Thomas gave of them. Brooks testified that he could not say whether Mrs. Tracey understood either the checks or the accounts, nor, indeed, did he say that he himself understood them, while Mays, referring to Mrs. Tracey, testified that she "didn't seem to understand it and none of the rest didn't seem to understand it," and she did not appear to be satisfied with Tom's explanation. Although it appears from the record that Tom did give an explanation, and did exhibit his checks and accounts, and did submit to an examination as to them by one or more of those present, it is silent as to what that explanation was, as well as to what his checks and accounts showed. It does appear that in 1927 he sent a check to a Mr. Zouck for $108 in payment of a note given by Mrs. Tracey, and, while it may be inferred that that was his check, even that fact is not clear, nor does the check itself, although offered in evidence, appear in the record. During the conference, Mrs. Tracey was very much "worked up," was "highly nervous" and angry, and Joe, one of the sons, in her presence and in his presence, stated that Tom "was trying to rob his mother," and he was also active in examining Tom as to the "day and dates" of certain bills which Tom presented. At the same conference Mrs. Tracey, refer-

ring to a claim made by Tom for blacksmith work, said: "I want Tom paid. I provided that in the will."

It has been stated that Thomas Tracey acted as his mother's agent. That relationship arose in this way: He lived across the road from her, and it was more convenient for him than for the other children to visit her and to attend to her needs. After her husband's death, the farm was operated by her grandson, Vernon Tracey, for her until 1927, when she leased it to Thomas under an agreement which in part provided as follows: "The said Sarah E. Tracey has rented to the said William T. Tracey her farm located in the fifth district of Baltimore County on the road leading from Hereford to Hampstead about one mile and one-fourth of a mile south of the White House for three years from the 16th day of September, 1927, with the privilege of five years. The party of the first part agrees to let the party of the second part have her farm and he is to furnish her a living and pay all taxes, and all fire insurance, but is not to pay any of her doctor bills, and he is not to have anything to do with the house she lives in, and both the party of the first and second part agrees that if either of them fails to comply with the above agreement they shall forfeit and pay the sum of one thousand dollars." After the execution of that lease, Thomas took possession of the farm and operated it while his mother still continued to occupy the dwelling on the farm; he supplied her with such necessaries as she required, he and his wife, Susie, cared for her, nursed her, and looked after her home, and he attended to such business as she had, until the dispute as to the bank account in August, 1928. It also appears that she repeatedly expressed her satisfaction with the manner in which Tom and his wife cared for her, and that she was reluctant to leave her own home for that of any one of her children, and that she finally did so only after repeated requests by some of the appellants. It also appeared that between 1924 and 1927, before she leased her farm to Thomas, she made a will in which she disposed of her entire estate, under which she left a nominal legacy to Emory, one of her sons, and the balance of her property in substantially

cqual shares to her other children except that to one or two, including Thomas, she left small additional legacies.

On November 30th, 1928, shortly before she left the farm, Joseph and Silas, her sons, and Mr. Carr, her son-in-law, appeared at the office of Mr. William P. Cole, Jr., a member of the Baltimore County Bar, and consulted him in reference to "a controversy with their brother Tom," and, apparently as a result of that visit, Mr. Cole a few days later saw Mrs. Tracey at her home on the farm. On that occasion Mr. Cole said "she was seated in a chair, in the center of the room clothed in pretty heavy garments, she had on, I remember, something that resembled one of those lumber jackets that the boys wear, tight up around her neck, like this (indicating). She had her head wrapped in a shawl, she was for all practical purposes, she was very, very thin, in fact nothing on her bones of her hand except skin and blood vessels, that was about all, physically she was about as near a wreck as anything you could possibly see, but she talked with me and talked very fluently and explained different matters that I was interested in. She didn't know some things about the relationship with the son, I thought she should have known." Nothing came of that visit, and although Joseph and Silas and Mr. Carr went to Mr. Cole's office on several occasions after that, for some reason which the record does not disclose he terminated his connection with them in the latter part of January, 1929.

On January 21st, 1929, the same three, Silas and Joseph and Mr. Carr, appeared at the office of Messrs. Brown and Shipley, attorneys in Westminster, and requested Mr. Shipley of that firm to prepare the deed which is the subject of this proceeding, and "told him in substance the manner in which the conveyance was actually made." Before he prepared it, he went to Hampstead by appointment and there met the same three gentlemen, who took him to Mrs. Tracey, then living with her daughter, Mrs. Alban, and, in the presence of Joseph and Silas and Mr. Carr, he interrogated her as to the contents of the deed he was to prepare. During that interview some reference was made to a will which she had

made, and, at the suggestion of some one there present, Mrs. Alban produced a will executed by Mrs. Tracey from a desk or little cupboard in the room, and, at the suggestion of some one, but finally at the request of Mrs. Tracey, Mr. Shipley or Silas dropped the will in a stove in the room and destroyed it. After the deed was prepared, Silas and Joseph and Mr. Carr called at Mr. Shipley's office for it, and at his suggestion called upon Mr. John M. Shanks, a notary public, and asked him to accompany them to Mrs. Alban's home "to take an acknowledgment of a deed for an old lady." When he arrived there they showed him the deed and explained that Mrs. Tracey was conveying the property to certain of the children but not to all of them. He was then taken to the second floor to see Mrs. Tracey, and he "read the deed to her and she described the property, said it was obtained in that manner as set forth in the deed, and said it was her intention to execute the deed, that she had made a will, but that she realized there might be some expense or trouble in connection with the settlement of the estate and that she preferred to execute a deed." The notary's fee and the fee charged by Mr. Shipley were paid by Silas or Joe.

It also appeared that, by an order witnessed by Mr. Samuel A. Brooks, Mrs. Tracey, on September 20th, 1927, changed an account standing in her name in the First National Bank of Hampstead so as to read: "In trust for myself and William Thomas Tracey, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor."

At the time of her death, which was caused by bronchitis complicated by the infirmities of age, Mrs. Tracey was about eighty years old. She was anæmic, feeble, and for some time immediately preceding her death she had a cough, she could not eat, she complained that she was nearly blind, she was unable to attend to routine household duties, her meals were prepared for her, her apartment kept in order by others, and from time to time she was confined to her bed by illness. Until she left her own home these services were usually performed by Thomas Tracey and his wife, but during the latter part

of her stay there Susie Tracey was stricken with some permanent and serious illness which left her helpless, and after that Tom was aided in caring for her by his daughter, Mrs. Bossom. During that period her other children, who had theretofore visited her at intervals, varying as to some from a few days to months and as to others from a few days to several weeks, became more attentive, so that towards the end of her stay at her own home at least one of them was constantly with her. During that period Joseph and Silas, also called "Ed," were active in their efforts to prejudice their mother against her son Thomas, and Mrs. Alban was importuning her to leave the farm and live with her at Hampstead.

In describing the effect of those activities upon her grandmother, Mrs. Stella Bossom testified in part as follows: "Well, she was always very pleased when I went in there, only except sometimes as I say when some of them come over and got to talking to her, she seemed kind of nervous and at different times when I always asked her how she felt and she said, 'all right, but I am so nervous'; I said 'Grandmother, why do you let yourself get worked up like that?' and she said, 'well, you can't help it sometimes,' and one time I remember along in July she was right worked up, her daughter came after her and wanted to take her to her home. I think she came three times in that week, * * * and on Sunday afterwards, that was about the time I thought she had went she seemed very nervous and dissatisfied, and I asked her what was wrong and she told me they wanted her to go away, that her daughter Nora wanted to take her to her house and I said, 'why don't you go?' and she said, 'I don't want to go, I don't want to leave here,' and I asked her, I said, 'well, are you not satisfied here,' and she said, 'yes, I never want to leave this place as long as I live, because when old people go away from their home they don't live long afterwards.'" Referring to another occasion, a few days prior to the family conference on November 24th, the witness said: "I went in and I spoke to her and asked her how she felt and got the same answer, she was nervous.

\* \* \* I asked her, I said, 'Grandmother, have you got any of your medicine,' and she said, 'yes,' and I said, 'why don't you take some of it?' and she said, 'I don't think medicine will do me any good,' and I said, 'why?' and she started to cry and fill up, and I said, 'what is the matter?' and she said, 'they are trying to get me to go away from here and I am not going,' and I said, 'why?' and she said, 'I lived here all my life and I want to stay here.'" And, finally, describing a conversation between her and Della Carr, her daughter, and Joseph and Silas Tracey, her sons, the witness said, "And they were discussing what she got to eat and who bought it and what was brought to her and so Uncle Ed and Uncle Joe both told her not to receive anything that was brought to her and Aunt Della spoke up and said they set it on the table and they won't take it back, and they said, 'if they don't take it out, throw it out.'" Another witness, Amos Bossom, testified that just before Thanksgiving, 1928, she said to him: "I have always been contented, \* \* \* 'the only way I will ever go away from here when they carry me out the door,' I said, 'Grandmother, who is trying to get you away, she said, 'they are all after me,' I said, 'the only thing I can tell you is use your own judgment,' I said, 'you satisfied here?' and she said, 'yes, always been,' and she said, 'you know when I leave here I won't last long.'"

The immediate and precise question presented by the appeal is whether those facts are sufficient to support the conclusion that the deed from Mrs. Tracey to certain of the appellants was induced by undue influence exercised and practiced upon her.

In dealing with that question a consideration of primary importance is whether the grantees, at the time the deed was executed, stood in a position of confidential relationship towards the grantor. In some cases, as in transactions between guardian and ward, attorney and client, trustee and *cestui que trust*, or in the case of a voluntary conveyance from a child to a parent, the law presumes such a relationship from the very nature of the association between the parties, while in others, as in this case, the relationship is

318

not presumed from the mere nature of the association, but must be established as a fact. *Upman v. Thomey,* 145 Md. 358, 125 A. 860; *Zimmerman v. Hull,* 155 Md. 238, 141 A. 531; *Taylor v. Pivec,* 149 Md. 530, 131 A. 757; *Zimmerman v. Frushour,* 108 Md. 126, 69 A. 796. Many general expressions are found in the cases and in the text-books concerning the quantum of proof necessary to establish such a relationship as a fact, but such statements can safely be accepted only as guides and not as establishing definite rules or fixed limits, because the circumstances under which such a relationship may arise are so varied that it would be unwise to limit the application of the equitable principles involved by attempting to enumerate and define the facts to which such principles may be applied. *Chase v. Grey,* 134 Md. 623, 107 A. 537; *Pomeroy, Eq. Jur.,* sec. 956. But while that is true, there is nevertheless running through the cases in which the question has been considered this principle, that, where the relationship between the parties to a transaction which is the subject of judicial examination is such that one must from the very necessities of the situation repose confidence in the other, and where the one in whom such confidence is reposed is thereby enabled to exert a dominating and controlling influence over the other, a confidential relationship may be presumed. *Todd v. Grove,* 33 Md. 188; *McGill v. Nichols,* 157 Md. 294, 145 A. 773; *Pomeroy, Eq. Jur.,* sec. 956. Illustrating the application of that principle, it was held, in *Beinbrink v. Fox,* 121 Md. 104, 88 A. 106, "that, where an aged parent makes a conveyance to a child, the burden is cast upon the grantee of establishing the fairness of the transaction," and, while that statement is limited by the facts peculiar to that case (*Upman v. Thomey, supra; Henry v. Leech,* 123 Md. 436, 91 A. 694), the court in *Highberger v. Stiffler,* 21 Md. 338, 83 Am. Dec. 593, referring to a similar situation, said: "The natural relation of the parties was reversed in this instance by the influence of time. The parent had become a child, and the child was guardian to the parent. The same dependence, overweening confidence, and implicit acquiescence, which rendered one an

automaton in the hands of the other, existed '*et ubi eadem ratio, ibi idem jus.*' The wish of the agent had become the will of the principal. Whatever the former suggested, the latter executed. There was no consent of two minds, but a merger of the principal's mind into the agent's."

In *Henry v. Leech, supra,* the grantor, then about eighty-one or two years of age assigned to his daughter the sum of $3,377, on deposit in a savings bank. Until a few days before the deed he and his daughter had lived apart for years, and he had until then managed his own affairs. It was held that those facts were insufficient to establish a confidential relationship. In *Reck v. Reck,* 110 Md. 497, 73 A. 144, where a father, aged seventy-five years, had granted all of his property to his son, a finding that the son stood in a confidential relation to the father was based largely upon the grantor's age and mental condition. In *Kennedy v. McCann,* 101 Md. 651, 61 A. 625, which involved an alleged gift of $5,000 from a mother to her son, it was held that, since the evidence failed to show that the son had any domination or control over the donor, or that he had custody and control of her property, or that he attempted to interfere with her personal liberty, or to forbid access to or intercourse with her by other members of her family, it was insufficient to establish a confidential relationship. In *Thiede v. Startzman,* 113 Md. 278, 77 A. 666. Mrs. Thiede, then sixty years old, granted all of her estate to her son and son-in-law, and the court, in finding that at the time she executed the deed a confidential relation existed between her and the grantees, based its conclusion largely upon the fact that she reposed entire confidence in the unselfishness of the motives of the grantees, and that but for such confidence she would not have executed it. In *Zimmerman v. Hull,* 155 Md. 241, 141 A. 531. 535, in sustaining a deed from a sister to her brother, it was held that the mere fact that the sister had confidence in her brother was not sufficient to establish a confidential relationship, in the absence of evidence showing a "resulting superiority and influence," and upon the facts of that case it was found that the sister was intellectually superior to the

brother, and that she was a strong, forceful character. In *Taylor v. Pivec,* 149 Md. 526, 131 A. 757, 759, a woman sixty-six years old with unweakened will and unimpaired faculties, who attended to her affairs until her death seven years later, and who had a husband to advise her, gave most of her property into the joint ownership of her unmarried daughter, with whom she lived upon terms of intimacy and affection, and herself, remainder to the survivor, to the exclusion of other children. There the court said: "The daughter and her aunt are shown merely to have lived in close intimacy and harmony with the donor, and a confidential relationship, upon which dependence of the donor may be assumed, cannot be made of that mere intimacy and harmony. There must be something more; and it has not been shown to exist in this case." In *Bentley v. Bentley,* 141 Md. 428, 119 A. 293, 294, a woman seventy-eight years old, about a year prior to her death, conveyed her property to one who held a mortgage on part of it in trust for herself for life with the remainder over to one of her two brothers to the exclusion of the other. Ben, the brother who was excluded, had on one occasion gone to her home when she was ill, and remained there over a year, and during that period she made the deed in question. Frank, the favored brother, lived about a mile away. He testified that on one occasion she called him in the house and "wanted to know what she could do to keep her brother Ben from disposing of everything on the place," and he suggested that Mr. Travers, the mortgagee, be appointed trustee. She consulted Travers, and shortly afterwards the deed was prepared, and Mrs. Bentley taken to Frank's home to execute it. She had great confidence in Frank, and often called upon him for advice and assistance; he did her shopping before his brother Ben came, and afterwards did some of it. Those facts the court held sufficient to establish a confidential relationship.

Without further citations, these cases should be sufficient to fairly illustrate the application of the general principle that, where an aged and infirm parent, in a position of dependence upon his own child, who exercises a corresponding

influence and authority over him, voluntarily conveys valuable property to that child, the burden is upon the donee to establish the *bona fides* of the transaction. *Pomeroy, Eq. Juris,* sec. 962 n. 4c.

While the question is not wholly free from difficulty, in our opinion, these facts are sufficient to require a finding that at the time the deed from Mrs. Tracey to six of her children was executed, the grantees did stand in a position of confidential relationship to her. At that time she stood in the shadow of impending death, enfeebled by the infirmities of age and disease, and nearly blind, and was necessarily completely dependent upon them, not only for the attention which her physical condition required, but for advice and even for communication with any one other than the appellants. And that they exercised a corresponding influence and authority over her is also apparent. She broke up her home in obedience to their wishes and against her own, and moved into a home where the son who was excluded from the deed was not welcome, but where she would at all times be surrounded by influences hostile to him, and from the time she went there it does not appear that she took part in any transaction in which one or more of the appellants were not active and important agents. As a corollary of that conclusion it follows that the burden was upon the appellants to show that the deed under attack in this case was the free and voluntary act of the grantor, untainted by fraud or undue influence. *Upman v. Thomey, supra; Owings'* case, 1 Bland (Brantley's Ed.), 374, note f; *Todd v. Grove,* 33 Md. 188; *Cherbonnier v. Evitts,* 56 Md. 276; *Kerby v. Kerby,* 57 Md. 345; *Zimmerman v. Bitner,* 79 Md. 125, 28 A. 820.

Undue influence has been so often and so clearly defined in former decisions of this court that any addition would be but useless elaboration. *Longanecker v. Somers,* 148 Md. 587, 129 A. 896; *Brantly's Digest; Carter's Digest; Grove v. Spiker,* 72 Md. 300, 20 A. 144; *Hiss v. Weik,* 78 Md. 439, 28 A. 400; *Davis v. Calvert,* 5 G. & J. 269. Its landmarks are the divergence of the results accomplished in a

given case from those which would ordinarily be looked for, when the relation of the donor to the beneficiary, their antecedent relations to and dealings with each other, the legitimate but unrecognized claims of others upon the bounty of the donor and their dependence upon him, the instincts of justice, and the natural ties of parental affection, are considered (*Davis v. Calvert, supra*); the effect of the grant upon the donor (*Whitridge v. Whitridge*, 76 Md. 77, 24 A. 645; *Thiede v. Startzman, supra*); a manifest and substantial conflict between the deed or testament under consideration and the settled purpose of the donor (*Cherbonnier v. Evitts, supra; Frush v. Green*, 86 Md. 494, 39 A. 863); previous declarations of the donor inconsistent with the results accomplished by the will or deed, as the case may be (*Frush v. Green, supra*); a marked activity and interest by the beneficiaries in bringing about the execution of an instrument by which they profit; and in some cases the absence of independent advice from disinterested sources or a reasonable opportunity to secure it. These circumstances neither singly nor collectively are sufficient to conclusively establish the fact that a deed, will, or other instrument under attack, was procured by undue influence, but are nevertheless to be considered in connection with all other circumstances attending the transaction, such as the mental and physical condition of the donor, his age, and situation at the time he executed the instrument, as facts relevant and material to any inquiry as to whether his act was induced by undue influence.

Turning again to the immediate question, in our opinion, the deed from Mrs. Tracey to six of her children was not her free, voluntary, and unbiased act, and we fully concur in the decree of the chancellor setting it aside.

Summarizing what has aready been said, the evidence in the case shows a fixed and implacable hostility on the part of the appellants towards their brother Thomas, and a settled purpose on their part to destroy the sentiments of confidence and affection which his mother at one time entertained for him, to the end that he might be excluded from

any share in her estate. In furtherance of that purpose, in her presence one of them openly accused him of robbing his mother, although it does not appear that he knew of a single fact to justify the charge; for some time before she left her home on the farm one or more of the appellants was constantly with her, apparently on guard to prevent any intimate or confidential communication between her and Tom; by continued and importunate urging they induced her against her own wishes to leave her own home, where she was in daily contact with Tom, for the home of Mrs. Alban, where she would be wholly dependent on them. Even before she left that home three of them, Silas and Joe and Mr. Carr, consulted counsel "relative to a controversy with their brother Tom," and when the attorney whom they consulted severed his relation with them, the same three inseparable and persistent gentlemen appeared at the office of Messrs. Brown and Shipley in Westminster, and told Mr. Shipley that their mother wanted to "make this deed, and in substance the manner in which it was actually made," and later, before it was actually prepared, they met him at the station, took him to see Mrs. Tracey, and remained throughout the interview which followed. At that interview Mrs. Tracey told the attorney that she had discovered, as she thought, that Thomas had already gotten more than his share of the estate, although only a few weeks before she had said that she was in his debt, and intended to compensate him by will; and there was no apparent source from which she could have received that impression other than the appellants. After she went to live with Mrs. Alban, she wrote her attorney for a will which she had made some five years before, and, at the suggestion of some one present, it "might have been any one of the children," at the interview with Mr. Shipley, Mrs. Alban produced the will under which Tom received a special legacy of $400 in addition to an equal share in the balance of her estate, and, after asking Mrs. Tracey three times if "she was sure she wanted that will destroyed," either the attorney or Silas dropped it in the stove. After that the same three, Silas and Joe and Mr. Carr, journeyed again to

Westminster, received the deed from Mr. Shipley, and returned with it and a notary public to Mrs. Tracey, but, before actually going into her presence, they explained to the notary what Mrs. Tracey was to do, and, when she actually executed it, Mrs. Alban, Silas, and Joe were present. These facts, taken in connection with the suspicious circumstance that neither Silas nor Joe nor Mr. Carr was apparently willing to trust either of his associates, but that at every step leading up to the execution of the deed all three were present and each was in a position to watch the others, with the fact that by the execution of the deed Mrs. Tracey stripped herself of practically her entire estate, the fact that at the time she executed it she was nearly blind, feeble, helpless and suffering from the infirmities which ended her life some six or seven weeks later, and the further fact that, at the time she executed it, she was wholly dependent upon and surrounded by persons who benefited by it at her expense, in our opinion are wholly inconsistent with the theory that the deed was the free, voluntary, and unbiased act of the grantor, and the decree appealed from will be affirmed.

*Decree affirmed, with costs.*