# LEAH E. GILTZ et al.

## vs.

## JOHN F. O'MALLEY.

### Principal and Agent—Confidential Relations.

That defendant, with whom plaintiff's decedent boarded for a number of years, and with whom and whose family decedent was on intimate terms, frequently withdrew considerable sums from savings banks in which decedent had accounts, and that it did not clearly appear what became of the sums so withdrawn, *held* not to create any burden on defendant to show that he did not appropriate these sums, it appearing that decedent was alert and vigilant in looking after her own affairs; that she kept her bank books in her own possession, as well as any money which she had in the house, which sometimes amounted to considerable sums, and that she made liberal gifts to her church, as well as to relatives. pp. 292-295

That defendant, on his frequent trips to the city, was requested by decedent to withdraw money from the savings bank, and did so, by means of orders signed by the latter, did not involve such confidential relations between him and decedent as to impose on him the burden of showing, by entirely disinterested witnesses, that he paid the money to decedent, or what disposition was made thereof by the latter. p. 296

*Decided December 9th, 1919.*

Appeal from the Circuit Court for Howard County. In Equity (FORSYTHE, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*Frederick J. Singley* and *John Hinkley,* with whom were *Hinkley, Hisky & Burger* and *James Clark* on the brief, for the appellants.

*Edward M. Hammond* and *Joseph C. France,* with whom was *Charles C. Wallace* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Howard County dismissing the bill of complaint of Leah E. Giltz and others, who are the legatees under the last will and testament of Sarah E. Hobbs, late of Howard County, Maryland, deceased, against John F. O'Malley of said county and State.

Mrs. Hobbs was married twice. Her first husband was Bernard Boyle, who died in 1872. In 1894 she married George W. Hobbs, who died about 1896. There was no issue of either marriage, but at the time of the death of her second husband Mrs. Hobbs had a number of nieces and nephews among whom were the plaintiffs, appellants, in this case. During the life of her first husband Mrs. Hobbs lived in Elkridge, Howard County, at the "Howard House," a property owned by her, and in which she kept a store and took transient boarders, while her husband, it is said, owned a team and "did some hauling." She started an account at the Savings Bank of Baltimore in 1862, and the evidence shows that in 1898 she had in that bank $5,426.68, and that in November of the same year she started an account in the Eutaw Savings Bank, of Baltimore City, by a deposit of $7,938.00. In addition to the Howard House Mrs. Hobbs also owned a house in Elkridge, which she rented to the appellee and where he and his family resided, and another property containing about seventy acres of land. She had raised her niece, Susannah Boyle, wife of William H. Boyle of New York, and her niece Mrs. Giltz, before her marriage

to Mr. Giltz, had also lived with her for several years. After the death of Mr. Hobbs, Mrs. Hobbs, who was living at the Howard House alone, and who was about seventy-four years of age, wrote to Andrew Quirk, whom she had taken from the St. Mary's Industrial School in 1872 when he was about twelve years old, and who had lived with her until he was about nineteen years of age, asking him to come and live with her, and he, with his wife and wife's sister, moved from Baltimore County to the Howard House in 1900 under an arrangement by which he was to pay Mrs. Hobbs a monthly rental of $10.00 and furnish her with board and lodging free of charge. He lived there until the fall of 1902, and, according to his testimony, while he was there Mrs. Giltz collected Mrs. Hobbs' rents for her, took charge of her bank books, and took them to the bank when necessary. In the meantime Mrs. Hobbs was endeavoring to persuade the defendant, appellee, whom she had known from his childhood, and who lived near her in Elkridge, to come to the Howard House to live with her. She stated to the defendant and his wife, whom she visited frequently, that she was getting old and had no one to look after her, and that her people did not want to take care of her and did not want her. She also got their pastor, Father Doory, to urge the defendants to go to live with her on the ground that her own people did not want her, and her niece, Mrs. Giltz, who lived at Harman's Station about five miles from Elkridge also insisted upon their moving to the Howard House, and said to Mrs. O'Malley that if she and her husband were not willing to take care of her (Mrs. Hobbs) she would have to go to a home as she did not want her and none of her people wanted her. The defendant, with his wife and one child, moved to the Howard House in the fall of 1902, under an agreement with Mrs. Hobbs by which he was to pay her $10.00 per month for the property and furnish her with board and lodging free of charge. In 1904 Mrs. Hobbs executed a will by which she devised the Howard House property to the defendant and required him

to pay, as a charge upon the property, the sum of $1,000.00 to Mrs. Bertie Saylor and $500.00 to her nephew, Charles Disney, of Anne Arundel County. After providing for a legacy of $100.00 to her niece, Mrs. Mary Pitzinger, who formerly lived with her, and a legacy of $250.00 to Father Doory, a bequest of her watch and chain to her niece, Mrs. Warfield, and a bequest of her furniture and china to Mrs. Giltz, she directed her executor, the defendant in this case, to sell all the rest of her property, and bequeathed the proceeds thereof, together with all the rest and residue of her estate to her following nieces and nephews, share and share alike, viz: Basil Harman, Everard Harman, James R. Benson, Leah Giltz, Mary Sidney Warfield, all of Anne Arundel County, Maryland, Ella Jane Sumwalt of Baltimore, Maryland, Mary Catherine Padgett of Philadelphia, Pennsylvania, and "Susan Boyle" of New York City. On the 7th of September, 1906, Mrs. Hobbs conveyed the Howard House property to the defendant in consideration of the sum of $2,000 and an agreement on his part to provide her with a home with his family during her natural life in the dwelling house on said property and to furnish her with board and lodging free of charge, and on the 18th of the same month she executed a codicil to her will, reciting the conveyance of the property to the defendant, giving to Mrs. Giltz $400.00 of the $500.00 bequeathed in her will to her nephew, Charles Disney, and directing that said legacies to Charles Disney, Mrs. Giltz and Mrs. Saylor be paid out of her estate. After the death of Mrs. Boyle and Everard Harman, two of the residuary legatees named in her will, Mrs. Hobbs, in April, 1911, executed another codicil to her will, reciting their death, and naming the remaining residuary legatees as the persons to take the residue of her estate.

Mrs. Hobbs died in May, 1917, at the age of ninety-one years, and after her death the defendant, as executor, filed an inventory of her estate amounting to $4,714.42. Mrs. Giltz and the other residuary legatees named in the will and

codicils, on the 20th of November, 1917, filed their bill of complaint against the defendant, appellee, "individually and as executor," and his wife, Nellie O'Malley.

A demurrer to the original bill having been sustained, the appellants filed an amended bill of complaint against the appellee alone, which was sworn to by Mrs. Giltz, and in which they allege that in 1900 the appellee, knowing that the decedent was seventy-four years of age and possessed of considerable means, "with the express intention of depriving the natural beneficiaries of her bounty, * * * by a wrongful and fraudulent appropriation of her estate during her life," moved with his family to the Howard House, and rented the property at a nominal rent and agreed to provide the decedent with a home with his family free of charge for lodging and board; that in 1906 the decedent, for the "recited consideration of $2,000.00," and an agreement on the part of the appellee to furnish her with a home during her natural life, conveyed said property to the appellee; that from the year 1903 to the time of her death the decedent, being "advanced in age, feeble and impaired in health" made the appellee her confidential agent and attorney; that the appellee "ingratiated himself into her confidence," in consequence of which the decedent "trusted him implicitly, confided to him the collection of" her income, "the care and attention of her property, and placed in his custody her private papers and bank books, consulted him in every matter connected in any way with her affairs, abiding by his advice and judgment," and acted upon his suggestions, and that by reason of her age, and the "skill and experience, and artful and persistent persuasions and importunities" of the appellee, he procured the conveyance of the Howard House property without adequate consideration; that between July, 1903, and the end of 1905, the appellee, by means of the improper use of the confidential relation existing between him and the decedent, and in furtherance of his intention to deprive the appellants of her estate, withdrew from the Eutaw Savings Bank the sum of

$6,800.00 on deposit to her credit by procuring her signature
to orders on said bank; that in like manner, during the period
from 1907 to the date of her death, the appellee, by the im-
proper use of the confidential relation existing between them,
withdrew from the Savings Bank of Baltimore the sum of
$7,843.00 on deposit to the credit of the decedent; that in
addition to the sums withdrawn from said banks, and the
retention of the alleged cash consideration of $2,000.00 for
the Howard House property, the appellee, as the confidential
agent and attorney for the decedent, received the sum of
$4,250.00 from Mary M. Dempster in settlement of the sale
of a tract of seventy-eight acres of land belonging to the de-
cedent, which the decedent instructed him to deposit to her
credit in bank, but which he appropriated to his own use.

The bill prayed that the defendant be required to answer
under oath, and to show fully all sums received by him from
or for account of the decedent while acting as her confiden-
tial agent and the disposition thereof; that the sums of money
withdrawn by him from the savings banks "be impressed
with a trust for the benefit" of the decedent's estate; that he
be required to account for the sums received by him from the
banks and from the sale of the property of the decedent, that
the sale of the Howard House property be set aside, and for
general relief.

The defendant answered under oath and fully all the alle-
gations of the bill. He denied that he went to the Howard
House with the intention of depriving the plaintiffs of the
decedent's estate, and alleged that he had known the decedent
from his boyhood, and that for two years prior to his going
there she "had continually requested his wife and himself to
move" there, "stating that none of her nieces or nephews
would permit her to reside with them." The answer admitted
that he had occupied the property under an agreement to pay
the decedent a monthly rental of $10 and that that arrange-
ment continued until 1906, and alleged that in 1906, because
of certain necessary improvements to be made in the dwell-

ing house, the decedent, "of her own notion," offered to convey the property to him upon the terms stated in the deed; that the cash consideration named in the deed was paid to her in the presence of Henry S. Bell, a justice of the peace, and Vincent B. O'Malley, and no part of it was ever returned to him, and that from the date of the deed to the time of her death he faithfully complied with his obligation to provide the decedent with a home with his family free of any charge for table board or lodging. The answer denies that the decedent ever constituted the appellee her confidential agent and attorney, or that she confided in him the collection of her income or gave him the care and custody of her property, private papers or bank books, or consulted him in every matter concerning her affairs, or that he made any suggestions to her as to the management or disposition of her property, and alleges that "the property, books and papers of the decedent were at all times under her absolute control and dominion and were kept in an iron box in her possession and the key to which was always in her possession," and that at no time did the appellee enter said box until after the death of the decedent for the purpose of obtaining the will in which he was named as executor. It denies that the appellee by undue influence induced the decedent to sign orders on the Savings Bank of Baltimore or the Eutaw Savings Bank, drawn to his order and indorsed by him, but admits that during the time she resided with him he on many occasions withdrew from both of said banks sums of money on orders signed by her, and alleges that "at all times he did so by her express request, and after obtaining said sum always returned the same to her, and at no time either retained or received any part thereof from her." In answer to the allegations of the bill that from 1903 to the end of 1905 he withdrew from decedent's account in the Eutaw Savings Bank the sum of $6,800.00, and during the period from the year 1907 to the date of her death he withdrew from her account in the Savings Bank of Baltimore $7,843.00, the appellee

stated in his answer that it was impossible for him to remember accurately the amounts he withdrew during both of said periods. The answer further denies that the appellee was instructed to deposit to the credit of the decedent the sum of $4,250.00 the proceeds of the sale of property to Mary M. Dempster, and alleges that on the contrary he at the request of the decedent attended the settlement of said sale and received either from the B. & O. R. R. Co. or from Mary M. Dempster a check, and at the request of the decedent he got the check cashed and turned all the money over to her, and she paid him out of it $75.00 for his services in attending to the settlement, and that he had no knowledge or information as to what disposition she made of the balance.

In addition to the evidence to which we have already referred the bank books, offered in evidence, show that the decedent in the fall of 1902, had to her credit in the Savings Bank of Baltimore $6,743.18, and that when the account was closed after her death the balance was $1,471.39, and that in the fall of 1902 she had to her credit in the Eutaw Savings Bank $7,504.93, and that the balance remaining after her death was $246.85. The orders and receipts for the withdrawals from the Savings Bank of Baltimore show that seventeen of said orders, amounting to $6,642.00, were signed by the decedent and payable to the appellee, who signed the receipts for the money, and the orders and receipts for the withdrawals from the Eutaw Savings Bank show that seven of said orders, amounting to $7,100.00, were signed by the decedent and payable to the appellee, and that he signed the receipts for the money. All of the withdrawals from the Eutaw Savings Bank on orders payable to the appellee were between July, 1903, and October, 1905, and the withdrawals from the Savings Bank of Baltimore on orders payable to the appellee were between 1909 and 1917, the larger ones, viz, $2,200 $300, $1,500, $1,000, $500, $400 and $818, amounting to $6,718, having been made prior to April 1915.

The uncontradicted evidence in the case shows that from the time the appellee moved to the Howard House to the time of the decedent's death the relations existing between her and the appellee's family were most cordial and friendly; that they lived together as one family; that the decedent received from Mrs. O'Malley the care and attention of a faithful daughter, that she fully appreciated their kindness to her, often spoke of it to others, and frequently referred to the appellee's son, who was born after the appellee moved to the Howard House, as her boy. The undisputed evidence also shows that the decedent was physically and mentally a very vigorous woman; that she was careful, prudent and alert in business matters, and, according to the testimony of the appellant, Mrs. Giltz, a very positive character who was not influenced by others, and who "did what she wanted to do"; that she was quite active and enjoyed good health up to within two years of her death, and that there was no impairment of her mental faculties until the last two years of her life and then only during brief attacks or periods of sickness; that from the time the appellee moved to the Howard House to the time of the decedent's death Mrs. Giltz visited her frequently, or as Mrs. Giltz states it, "sometimes once a week, sometimes once every two weeks and sometimes once a month," and was always received with courtesy and kindness by the appellee and his family, and that for the first five years the decedent visited Mrs. Giltz and her family, at Harman's Station, twice a year, and after that once a year until the year 1915, staying with them several weeks at a time, and always spending the anniversary of her birthday at Mrs. Giltz's home. It further appears from the testimony of Mrs. O'Malley that the decedent kept her bank books and any money that she had in the house in a tin or iron box in the top drawer of her chiffonier; that she kept the key of the box on her person, and that Mrs. Giltz was the only person other than the decedent she ever saw open the box.

It is apparent from what we have said that the evidence in the case furnishes no foundation for the averment in the bill that the appellee moved to the Howard House with the intention and for the purpose of defrauding Mrs. Hobbs and depriving the appellees of her estate, for the evidence shows that it was only after repeated requests of Mrs. Hobbs, and after being urged by their pastor, Father Doory, and by Mrs. Giltz that he and his wife consented to go there.

In this Court counsel for the appellants abandon the claim made in the bill that the deed to the appellee should be set aside, but they insist that he should be required to pay the consideration of $2,000.00 stated in the deed, and that he should also be required to pay the proceeds of the sale of property to Mary M. Dempster, amounting to $4,250.00. The evidence shows that the appellee paid Mrs. Hobbs the $2,000.00 mentioned in the deed for the Howard House property in the presence of the appellee's wife and his brother, and that he borrowed $1,000.00 of it from his brother for that purpose, while the evidence of Mr. Dempster, an entirely disinterested witness, is to the effect that the amount paid for the other property was $4,150.00, and that Mrs. Hobbs, some time after the sale and payment of the money, told him that she had received it from the appellee. To adopt the appellants' view in regard to these sums we would have to treat this evidence as entirely unworthy of belief, or would have to assume, without any evidence to support it, that Mrs. Hobbs gave these amounts back to the appellee. The theory of counsel for the appellants is that they have shown that a confidential relation existed between the appellee and the decedent, and that it was therefore incumbent upon the appellee to show what disposition was made of the amounts referred to, and that as there are no entries in the bank books indicating that they were deposited, the appellee must have appropriated them to his own use. Leaving out of view the fact that there is no evidence in the case to show that the appellee ever received these sums from Mrs. Hobbs

after they were paid to her, and without stopping to consider, in this connection, the necessary limitations of the doctrine of confidential relations, a careful review of the whole evidence leads to the conclusion that Mrs. Hobbs must have been in the habit of keeping large sums of money in her house, and that she began to dispose of her means in large amounts some years before the appellee moved to the Howard House. For instance, Mrs. Giltz states that on one occasion, evidently referring to a time prior to 1902, Mrs. Hobbs wanted to go to New York to see Mrs. Susannah Boyle, and that she sent for her and told her that she wanted to go to New York and did not want to leave her money in the house during her absence; that she had $625.00 in the house, and wanted to take $25.00 with her, and that she, Mrs. Giltz, deposited for her $200.00 in each of the banks and kept the remaining $200.00 out for her. In July, 1909, Mrs. Hobbs gave to Father Doory, pastor of St. Augustine's Church, the sum of $4,600.00, yet there is no entry in either of the bank books showing the withdrawal of any such amount, and the only inference is that she had the money in her house. Her account in the Eutaw Savings Bank shows that the first withdrawal from that account was $400.00 on the 24th of April, 1900, and that she withdrew from that bank $1,000.00 on the 25th of July, 1900, and $800.00 on October 19th, 1900, while the evidence contains no suggestion as to what disposition she made of these sums, unless they are accounted for in part by further donations to Father Doory of $400.00 and $700.00 in 1900. In view of this evidence the fact that the amounts referred to were not deposited in either of the banks is deprived of the significance it might otherwise have, and is not sufficient ground either for disregarding the evidence that they were paid to Mrs. Hobbs, or for the conclusion that they were subsequently returned to and misappropriated by the appellee.

This brings us to a consideration of the withdrawals from the banks. The evidence fails to support the broad averment

of the bill that Mrs. Hobbs made the appellee her agent and attorney, "Confided in him the collection of the income upon her investments, the care and attention of her property, and placed in his custody her private papers and bank books, consulting him in every matter connected in any way with her affairs, abiding by his advice and judgment and acting upon" his suggestions. The evidence does show that when, in 1909, a mortgage from her nephew, Basil Harman, or his wife, in favor of Richard N. Jeffrey was about to be foreclosed, and Mrs. Giltz appealed to her to take up the mortgage and Mrs. Hobbs consented to do so, she signed an order on the Savings Bank of Baltimore payable to the appellee, and got him to get the money and take it to the office of Mr. Anderson, attorney for Jeffrey, and receive the assignment of the mortgage to her; that in 1915 when Mrs. Giltz applied to her to let Basil Harman have an additional $800.00, to be secured by a new mortgage covering both loans amounting to $3,000.00, and she agreed to do so, she or Mrs. Giltz requested the appellee to have the mortgage prepared, and he drew the money out of the bank on an order signed by Mrs. Hobbs; that the negotiations resulting in the sale of the property to Mary M. Dempster in 1907, were conducted by Mr. Dempster, an attorney, with Mrs. Hobbs, and after the deed had been executed by her in Elkridge, Mr. Dempster explained to her that the property would have to be settled for in Baltimore and suggested to her to get some one to take the deed to Baltimore and receive the money, and the appellee went to Baltimore for that purpose; that, as we have stated, during the fifteen years that the appellee and Mrs. Hobbs lived at the Howard House the appellee made many withdrawals from the two banks on orders signed by her; that throughout that period the relations existing between the appellee's family and Mrs. Hobbs were friendly and cordial, and that she apparently had confidence in his integrity and ability. But this falls far short of establishing that Mrs. Hobbs constituted the appellee her agent and attorney

in the sense that she turned over to him her private papers
and bank books and the care and management of her affairs
and property, and acted in reference thereto only upon his
suggestion and advice.    Indeed the evidence presents quite
a different picture, and shows that Mrs. Hobbs was careful
in business matters, mentally alert, self reliant and keenly
alive to her rights and interest; that after the sale of the
property to Mary M. Dempster she employed Mr. Dempster
to sell another property for her, fixed the price at which it
should be sold, as she had done in the case of the sale to
Mary M. Dempster, and after the sale received the proceeds
from the purchaser or his agent; that (according to the only
evidence in the case) she kept her bank books and any money
she had in the house in a tin or iron box and the key to the
box in her possession; that even in the last years of her life
she employed the nurses to assist Mrs. O'Malley in taking
care of her and paid them herself; that she was devoted to
her church and pastor and made large donations to them;
that she provided by will for the disposition of her estate to
those who were the natural objects of her bounty, and from
time to time, and as late as 1911, made such changes therein
as were necessary to meet changed conditions and to carry
out her purpose; that she was loyally attached to those she
appointed beneficiaries of her estate, appreciated their cir-
cumstances and was ready and willing to use her means to
aid and assist them.

   The appellants rely upon the doctrine of confidential rela-
tions, and insist that the burden was on the appellee to show
what disposition was made of the amounts withdrawn, not
only by the appellee but by Mrs. Hobbs.    That doctrine, when
applied to the relation of principal and agent, as stated in
the leading Maryland case of *Todd* v. *Grove,* 33 Md. 188,
where the agency extended to the transaction of all business,
and the management of all the affairs of the principal, is
"that it is for the common security of all mankind that gifts
procured by agents, and purchases made by them from their

principals, should be scrutinized with a close and vigilant suspicion." Upon the facts shown to exist in that case the Court held that the burden was on the *donee* to establish to the full satisfaction of the Court that the gift was the free, voluntary and unbiased act of the donor. *Todd* v. *Grove,* with some variation in the statement of the doctrine, has been followed and the principle frequently applied in the later decisions in this State. *Zimmerman* v. *Bitner,* 79 Md. 115; *Horner* v. *Bell,* 102 Md. 435; *Zimmerman* v. *Frushour,* 108 Md. 115; *Thiede* v. *Startzman,* 113 Md. 278. But the principle invoked by the appellants, and the cases referred to, have to do with *gifts* obtained or benefits secured by those in whom confidence is reposed. In the case at bar it is not claimed that Mrs. Hobbs gave the appellee the amounts he withdrew from the banks, and the question here is whether upon all the evidence in the case he should be charged with the sums so withdrawn.

The orders upon which the money was withdrawn from the banks were all signed by Mrs. Hobbs, and all the larger sums withdrawn from the Savings Bank of Baltimore, amounting to $6,718.00, with the exception of the sum of $818.00 which was shown to have gone into the mortgage from Basil Harman to the decedent, were withdrawn prior to 1912, while all of the withdrawals by the appellee from the Eutaw Savings Bank were prior to 1906. There is no evidence that the orders were procured by fraud or deception, and it is conceded that during the time mentioned Mrs. Hobbs enjoyed good health, and if she was the kind of woman the evidence shows her to have been, it is difficult to see how she could have been year after year the victim of such repeated fraud and deception. If she retained possession of the bank books when they were not being used to make the withdrawals she must have known of the condition of the accounts, and even if she turned them over to another for safe keeping, of which there is no proof, and she was the careful and intelligent woman she is said to have been, it is

hardly possible that she could have been kept in ignorance of such repeated inroads upon her estate. Nor is it at all probable that after having provided by will for the disposition of her estate to those to whom she was evidently attached, and after repeated changes in her will in order to effectuate her purpose, she would have deliberately taken it from them and given it to the appellee, or have resorted to such a method of doing so. Again, the close and intimate relation existing between the decedent and Mrs. Giltz, and the opportunity Mrs. Giltz had to keep in touch with her affairs, renders it highly improbable that the depletion of Mrs. Hobbs' estate by the numerous withdrawals mentioned could have entirely escaped her attention. In addition to these features of the case, we have the testimony of Mrs. O'Malley, who witnessed Mrs. Hobbs' signature to most of the orders, and who states that she saw her husband pay Mrs. Hobbs the amounts withdrawn, and who also states, from what she saw, and from the information given her by Mrs. Hobbs, how they were disposed of by the decedent. According to her testimony the larger sums, and the proceeds of the Dempster purchase, were given to Mrs. Boyle, who was in bad health and had very little means, to Mrs. Giltz and to Mr. Giltz, while others were spent in repairing the decedent's properties, and the smaller amounts were retained by her for her own use. That she witnessed the payment by her husband to the decedent of *every one* of those amounts may be improbable, but it is not improbable, in view of the relations existing between the decedent and her family, and the manner in which they lived together, that she was *generally* present when those payments were made. It is true that Mrs. O'Malley cannot be said to be a disinterested witness, and that there may be some discrepancies in the testimony, but on the whole her testimony furnishes at least as reasonable an explanation of the disposition of the decedent's estate as any suggested by the evidence in the case.

If the relation existing between the appellee and Mrs. Hobbs, and her condition, had been such as was alleged in the bill, and she had turned over to him the entire management and control of her property and estate, the case would have presented more serious difficulty. But the services the appellee rendered the decedent in connection with the withdrawals from the banks, the transfer and execution of the mortgages and the payment of the consideration for the Dempster sale, were only such as any man might be called upon to render a woman living in his home, or as a member of his family. The evidence indicates that the appellee's business took him to Baltimore frequently, and it was only natural that he was selected to draw from the banks such money as Mrs. Hobbs desired. It is true that in doing so he, in a sense, acted as her agent, but if such an agency imposes upon the agent, under all circumstances, in case of the death of the principal, and when his mouth is closed as to all transactions with him, the burden of showing, by entirely disinterested witnesses, that he paid the money to his principal, or what disposition his principal made of it, there might be very few willing to incur the risk of even so simple a service.

After a careful consideration of all the evidence in the case we think the Court below was right in dismissing the plaintiffs' bill, and we must therefore affirm the decree.

*Decree affirmed, with costs to the appellee.*