# FRANK H. BENTLEY

*vs.*

# BENJAMIN A. BENTLEY.

*Undue Influence—Evidence—Deed of Trust.*

On a bill to set aside a deed, made by a woman seventy-eight years old, a year before her death, by which she conveyed all her property to one who had a mortgage on part of it, in trust for herself for life, with remainder to one of her two brothers, to the exclusion of the other, *held* that, in view of evidence as to the mortgagee's insistence that she omit the name of the other brother, that the deed was executed at the home of the brother whom she named, and that she had great confidence in the latter as well as in the mortgagee, whom she named as trustee, the deed should be set aside as procured by undue influence.

*Decided June 23rd, 1922.*

Appeal from the Circuit Court for Howard County, In Equity (Moss, J.).

Bill by Benjamin A. Bentley against Frank H. Bentley and James W. Travers to set aside a deed of trust. From a decree in favor of plaintiff, defendant Frank H. Bentley appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Daniel M. Murray* and *Joseph L. Donovan,* for the appellant.

*Leroy Pumphrey* and *James Clark,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

Miss Harriet S. Bentley lived on a farm in Howard County, Md., a few miles from Laurel. The value of the farm, which contained about 141 acres, is not definitely shown in the record, but Miss Bentley acquired a half in-

terest in it on August 12th, 1910, and on November 19th, 1918, after some proceedings in court, she acquired title to the whole of it, and gave a mortgage of that date on it to James W. Travers for $3,000—taking up a prior mortgage which he held on it. As far as the exhibits, etc., in the record indicate, the farm was apparently valued at about six thousand dollars in 1918.

On the 25th of June, 1919, Miss Bentley made a deed of trust to James W. Travers, trustee, by which she conveyed and assigned all the property she had, including the farm and personal property, *in trust* for him to manage the same and collect the income therefrom and, after paying all taxes, fixed charges and expenses, to pay the net income to her for her natural life, and after her death the trust to "close," and all the property "to be paid over, deeded, or transferred in whatever manner may be necessary and proper, by said James W. Travers, trustee, to Frank H. Bentley, absolutely." Miss Bentley died on July 22nd, 1920, leaving surviving her two brothers, Benjamin A. and Frank H. Bentley, and two nieces and a nephew, children of her brother Charles, who had predeceased her.

On June 17th, 1921, Benjamin A. Bentley filed a bill of complaint against Frank H. Bentley and James W. Travers as trustee and in his individual capacity, alleging that the deed of trust had been obtained through and by "duress, fraud and undue influence exercised and practiced upon" Miss Bentley, and praying that it be "annulled, set aside and held for naught," and that James W. Travers be required to render an account of all things received, had or done in connection with his supposed trusteeship. The lower court on March 28th, 1922, passed a decree setting aside the deed and declaring it to be utterly null and void, requiring the trustee forthwith to return to that court an account, and ordering the defendants to pay the costs. From that decree this appeal was taken by Frank H. Bentley.

Miss Bentley was about seventy-eight years of age when she made the deed of trust. The evidence is conflicting as

to her mental condition, although physically she was infirm
for some time prior to the execution of the deed of trust.
Forty exceptions were filed by the plaintiff to questions and
answers asked witnesses by the defendants relating to her
mental condition, and if we were required to pass on them
we would be compelled to hold that the most of them were
well taken, as laymen in most of the instances expressed
opinions as to her mental capacity without there being such
foundations laid· as are required by our decisions. The lower
court did not pass on the exceptions, but decided the case on
other grounds regardless of them, and hence we will not do
more than say that there was little or no probative force in
the testimony of the lay witnesses on either side as to the
mental condition of Miss Bentley, if we consider all of it,
although there were no exceptions filed by the defendants.
The testimony of Dr. Linthicum, the only physician exam-
ined, shows that he had not seen her *professionally* for about
two years before the deed of trust was made, and if he saw
her at all during that time, neither the time nor the cir-
cumstances are given. His evidence is not of much aid
to the court in reaching a conclusion, as it does not show
whether or not she was in such a condition as she might have
been easily influenced.

There are a few prominent facts which are determinative
of the case. When the record is stripped of immaterial
matters and some evidence on both sides as to her mental
condition, we find an old lady· seventy-seven or seventy-eight
years of age possessed of a farm, subject to a mortgage of
probably something like half its value, and some personal
property, the amount or value of which is not shown. She
had two brothers, two nieces and a nephew, children of a
deceased brother, who survived her. One brother, the plain-
tiff, had formerly lived in Maryland, but was staying with
his daughter in Washington, D. C., in 1918, when he was
called by some one over the telephone to go to his sister,
Miss Bentley, who was sick. He went there the first of

May, 1918, and remained until the fifteenth of September, 1919. He was evidently a man of small means, and made and sold brooms for a living. He testified as to a number of peculiar things she did, but we will not state them, as they do not throw much, if any, light on the case.

Frank H. Bentley lived about a mile from his sister's place. Before the plaintiff went there, he would take butter and eggs to market for her, and the plaintiff testified that his brother attended to business for her. He said that he and his brother talked about the condition of their sister's mind, and he told his brother "there ought to be a guardian put over her." He replied, "I know that, it ought to have been done five years ago." He was asked if he said anything else, and answered: "Well, I asked him if he wanted to go with me and have a guardian appointed. He never said whether he would or would not. He said it would make the family mad. I told him there was no other family but me and him and brother Charlie's children." That was in 1918. Miss Hattie E. Bentley, a daughter of the plaintiff, testified that her Uncle Frank said in their store, the latter part of the summer or early fall of 1917, that her aunt ought to have a guardian. Mrs. Sarah Jackson, an aunt by marriage of Benjamin and Frank Bentley, testified that Frank told her in 1917 that his sister was unable to do business, and when she was at Miss Bentley's in August, 1919, she told her that she did not know what she was signing when she signed the deed of trust. Frank H. Bentley said his brother, Benjamin, talked with him on one occasion about having a guardian appointed for her, "and I said, you want to make her good and mad, you just mention it to her." He said he did not remember telling his niece about having a guardian appointed.

There is no doubt that for some reason Miss Bentley did not feel very kindly towards her brother, Benjamin, although he spent more time with her than any other relative the latter part of her life, up to September, 1919. That she was

feeble and needed assistance in 1918, 1919 and until her death, cannot be successfully denied, but in October, 1919, Mr. and Mrs. Carr moved into her place. The evidence of the two defendants is sufficient to show that they did, consciously or unconsciously, influence Miss Bentley to do what she did do in reference to the deed of trust. Frank H. Bentley testified that as he went to market to do her shopping, she called him in the house, "and wanted to know what she could do to keep brother Ben from disposing of everything on the place. I said, well, I will do anything I can for you. Mr. Travers was suggested because he had a mortgage on the place. I suggested Mr. Travers be appointed trustee, and she said that was all right, and she said for me to tell him to come up. As far as the disposition of the property, I never mentioned such a thing."

It is asking a great deal of the court, to conclude from what appears in the record, that he did not know that he had been made a beneficiary in the deed of trust until he went up to Ellicott City some time later, the exact time not being shown. Miss Bentley was taken to his house, away from her own home where Benjamin Bentley, her other brother, was staying, to execute the deed. When it was being read to her and she executed it, her brother, Frank, remained outside of the house. What possible reason could there have been for having him excluded, if he was not to be made a beneficiary? Mr. Donovan, who drew the deed, testified that the message for him to go to see Miss Bentley came to him by telephone from Frank Bentley's place. Frank Bentley was asked, on direct examination, "When did you learn that you were the beneficiary under that deed of trust?" and replied: "Well, when Mr. Donovan came out, and said it is customary to present the pen to the beneficiary, I present this pen to you, Mr. Bentley." Anyone of ordinary intelligence would have known from that that he had been made the beneficiary, or at least would have made some inquiry about it when the pen was given to him. Mr. Donovan must

have either known, or have assumed that he did know he had
been. If Frank Bentley did not know what was in the
deed, he ought to have known it, as he says he was acting for
his sister, had sent for Mr. Donovan, and had seen Mr.
Travers about acting as trustee. It would have been inex-
cusable for him not to know what disposition his sister was
making of her property, when she was relying on him to have
it attended to, and it would be difficult to understand why an
attorney would not, under the circumstances, have informed
him, unless he assumed that he already knew, as Mr. Dono-
van must have known, when he gave him the pen with the
remark quoted. Frank Bentley admitted, on cross-examina-
tion, that he had written to Mrs. O'Brien, his niece, who
lives in New York State, in reply to inquiries about her
aunt's property, "Ben has been living with sister Hattie for
more than a year, and treated her badly that I went before
the court and had a trustee and guardian appointed to look
after her." He did not tell her that the property went to
him after his sister's death, or give her any definite informa-
tion about it. In point of fact, he had not had a trustee or
guardian appointed by the court, and he knew that.

Mr. Travers testified that Mr. Frank Bentley spoke to
him at Laurel of his sister's *"condition, and the people tak-
ing advantage of her,"* and asked him if he would be trustee
and look after her affairs. He said he asked him why he
would not, and "he said he would rather somebody disin-
terested take care of it. I said I wouldn't do it unless Miss
Hattie was willing." A day or two afterwards Mr. Travers
went to her house, and asked her about it, and she said she
was willing for him to take care of her matters, that "I
then told Mr. Frank Bentley, and he said I will get Mr.
Donovan to draw the papers up. He said you can take her
down to your place, I said, no, I would come up to your
house, and so my wife and myself went up to Miss Hattie's
and got her ready and went up to Mr. Frank Bentley's and
Mr. Donovan came." Again, he said: "He came to me at

Laurel, and asked me about the interest (referring to the interest on the mortgage), and he said didn't I think it would be a good idea to have some one look after Miss Hattie's affairs." Why did Frank Bentley suggest taking his sister down to Mr. Travers' place? Can there be any reasonable explanation of it excepting that it was due to the fact that her brother Benjamin was at his sister's house? Unless the deed was intended to be made as it was made, as Benjamin had suggested to Frank the advisability of having some one appointed, there could have been no reason for taking that old lady away from her home to have the deed executed. Common courtesy between brother and brother demanded that Frank Bentley should tell his brother Benjamin, who was at their sister's house, that she was about to make a deed of trust.

The question was asked Mr. Travers: "Was there anything said prior to the execution of the deed about the property going to Frank Bentley after her death?" and he replied: "When Mr. Donovan asked Miss Hattie how she wanted to dispose of her property after she had gone, she said 'She wanted it to be divided up equally between her two brothers.' Well, I said, 'If you want it that way I don't want anything to do with it.' Then she spoke up and said, 'I'll leave it all to brother Frank.' " Mr. Travers 'testified that she did not say, when he went up to see whether she was willing to have him take charge of her papers, about how she wanted the property to go, but he admitted that when the deed was signed he knew it was to go to Frank Bentley. What Mr. Travers says she said about it was when Mr. Donovan and Mr. Travers were both present, and there is nothing to show that they were present with her at any time, except the day the deed was made. Mr. Donovan said he went to her house twice—that the first time he went alone and the second time he took his wife and mother along. So it would seem to be clear that the conversation with her about the property was the day the deed was drawn, and, indeed, Mr. Travers

so testified. It must have occurred before Mr. Donovan said he took her into the room adjoining the porch, and read the deed over to her in the presence of Mr. Little, the notary, and Mr. Travers. If that was not so, then the deed must have been drawn, leaving the remainder in the property to Frank Bentley, before Miss Bentley said how she wanted the remainder left, but it is not shown by the testimony that the deed was changed after it was first drawn, although Mr. Donovan's recollection is that he drew the deed in Mr. Bentley's house, and Mr. Little spoke of Mr. Donovan detaining them there some time after he reached the house. At any rate, it would seem to be clear that when Miss Bentley went to her brother Frank's house on that day, she did not intend to leave the remainder to him alone, and it was only after Mr. Travers threatened to refuse to accept the trust, if it went to both, that she agreed to it going to her brother Frank. Mrs. Jackson testified that she was talking to Miss Bentley three or four years before August, 1919, and she said she wanted her property to be divided equally between her heirs.

Of course, an owner of property has the right to leave it as he or she pleases, if not contrary to some principle of law, and the law does not pronounce deeds or other papers invalid, simply because they are made by old people, or those in bad health, or those who are both old and in bad health. But the law does protect old and feeble people from being placed in positions that take away their freedom of action, and make it improbable, if not impossible, for them to carry out their wishes freely. It may be conceded to have been wise to place Miss Bentley's property in the hands of some one who would protect it, but if she was capable of executing a power of attorney, she could have appointed Mr. Travers her attorney in fact, and if she was not, a committee could have been appointed by the court. Moreover, there was no necessity to dispose of the remainder after her death in order to protect her, which is the reason given by Mr. Bentley for her wanting to make the deed, but we find this old lady making an irrevocable deed of trust, turning over to her mort-

gagee as trustee all that she had, real, personal and mixed, being away from her own home, and under the roof of the beneficiary named in the deed, who was to have all at her death. There was no attempt to explain why she was taken from her own home, turning her back on one brother, whom she said after she reached Frank's home she wanted to be one of her two beneficiaries. She may have changed her mind as to her nephew and nieces after she told Mrs. Jackson that she wanted to leave her property to her heirs, which would have included the nephew and nieces, but she was taken by the trustee to her brother Frank's house with an intention, so far as she was capable of having an intention, to have it divided between her nearest of kin, her two brothers, and is there met with the refusal of the trustee, in whom she had great confidence, as the record shows, to accept the trust if she included her brother Benjamin as a remainderman.

As we have seen, Frank H. Bentley testified that when his sister called him into her house she "wanted to know what he could do to keep brother Ben from disposing of everything on the place." It is only just to say that he denied on the stand selling any property belonging to his sister, which he did not account for, and there is nothing in the record to prove the contrary. But if there was any need of such protection against him, and if she was of opinion, justly or unjustly, that he was improperly disposing of any of her property, the simple, easy, and natural thing to do, was to send him away. She was not required to let him remain there, but even if it be assumed that the object in having Mr. Travers appointed trustee was merely to protect her from her brother Ben, there is nothing to suggest that she indicated a desire to dispose of her property remaining after her death, when she spoke to her brother Frank about keeping her brother Ben from disposing of her property. Mr. Travers testified that he had not said anything to Miss Bentley, and she did not say anything to him about how she wanted the property to go, when he went to see her about taking charge of her affairs. Again he was asked: "Did

she say anything to you about the disposition of her property?" and answered: "Not at that time," and that question was followed up by one: "Did she say anything about it at any other time?" and he answered, "No, sir." It was only when Mr. Donovan asked her, and she then said what we have stated above.

She had great confidence in Frank H. Bentley and James W. Travers, as the record clearly shows. The former said he did her shopping before his brother Ben came there, and after that he did some of it because his brother did not have a horse. In answer to the question: "Did you furnish her any assistance during the last ten years of her life?" he said: "Anything she wanted, she always came to me in selling her wheat and helping her financially." We do not want to be understood as intimating that there was anything wrong or suspicious in thus helping his sister, but the relations between them were such that when we find that she gave everything to him, subject to her life estate, especially under such suspicious circumstances as we have related, to the exclusion of her other heirs and next of kin, some valid explanation must be made.

It would unduly prolong this opinion to quote from many authorities bearing on the case. In *Chase v. Grey,* 134 Md. 623, JUDGE BURKE quoted, from 2 *Pom. Eq.* sec. 956, what has been in substance said in a number of our own decisions, but we repeat it as a concise statement of what is applicable here. It is there said: "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations, in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a confidential relation exists *as a fact,* in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic or merely personal." See also *Zimmerman v. Bitner,* 79 Md. 115; *Horner v. Bell,* 102 Md. 435, 444;

*Thiede* v. *Startzman,* 113 Md. 278, 287-289. In the last case JUDGE PEARCE quoted from *Cherbonnier* v. *Evitts,* 56 Md. 276, that "it is not inconsistent with the exercise of undue influence or artifice that the instrument assailed was executed voluntarily and with a knowledge of its contents," and he also quoted from Lord Eldon in *Hugenin* v. *Baseley,* 14 Vesey, 275, where he said: "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced; whether all that care and providence was placed around her as against those who advised her, which from their situation and relation with respect to her, they were bound to exert in her behalf."

We have considered the cases cited by the appellant, such as *Frush* v. *Green,* 86 Md. 494; *Somers* v. *McCready,* 96 Md. 437; *Giltz* v. *O'Malley,* 135 Md. 281, and others, but after giving this case and the authorities thorough consideration, we can have no doubt about our duty in the premises. The learned judge in the lower court filed an excellent opinion, and we fully concur with him in his conclusions. It would make but little difference where the burden was placed in this case, as there is little, if any, conflict in what we regard as the most material points.

No special point is made of it, and there was not, under the circumstances of the case, such laches on the part of the plaintiff in filing this bill, as calls upon the court to refuse to grant the relief prayed for. The decree of the lower court will be affirmed.

> *Decree affirmed, the appellant to pay the costs in this Court, the defendants in the bill to pay them in the lower court, as directed by the decree.*