# CIRCUIT COURT OF BALTIMORE CITY.

Filed November 13, 1923.

WEMPE
VS.
REIL.

Stephen W. Leitch and Edward L. Ward for complainant.

Benzinger & Dinneen for defendant.

DUFFY, J.—

This is a proceeding to set aside certain transfers of property on the ground of undue influence.

George H. Wempe was a route boss for the American Brewery for many years. He lived with the brewmaster, He left a brother and a sister, nephews and nieces as next of kin. There was an estrangement in the family about the time of the deaths of his parents which occurred about 20 years ago, but very fortunately through the good offices of Mr. Harry M. Benzinger, who settled the estates of the parents, the family were brought together and reconciled in Mr. Benzinger's office and after that they lived on terms

of amity. At the time of his death, which occurred March 13, 1923, but for the transfers mentioned he would have left an estate of about $12,000, most all of which he had received from his parents. He was a single man and died intestate at the age of 57 years. He had known the Reil family for many years, and two years and five months before his death, on the invitation of Mrs. Reil, he left the brewmaster's house and took up his abode at the house of Mrs. Quin, a daughter of Mrs. Reil at 2009 East North avenue. Mrs. Reil lived across the street at No. 2012. He gave up business six years before his death. The members of the Reil family were very kind to him and he was appreciative. They talked to him and entertained him and it was a common occurrence for him to spend the evening at Mrs. Reil's, where he used to sit in a comfortable armchair in which, when his strength waned, he would have to be propped up with pillows (p. 179 and 314).

Five years before his death, while still living at the brewmaster's, he had a carbuncle which was a serious affair as the wound lasted about five months, during which time it was dressed every day by Catherine Reil. In appreciation of this attention, he drew from the bank $50 in gold and gave it to Catherine, and he also gave her a diamond ring, so he told Mrs. Thalheimer. He did not need any more nursing until he took to his bed on January 13, 1922. From that time on, he was faithfully nursed until his death two months later, by Mrs. Quin and Mrs. Reil. For the services above mentioned, of course, Catherine, Mrs. Quin and Mrs. Reil were entitled to be paid; but the evidence does not disclose any services performed by other members of the Reil family for which, in my opinion, they would have a legal right for compensation. His health began to fail him in the spring of 1922, and after that, the chronology of this case should be noticed.

1. In mid-September he was notified by Dr. Heck that he had tuberculosis and that he had about six months to live, which turned out to be a fact.

2. About October 1, he went to see his sister, Mrs. Coxon, and asked for payment of $1,900 he had loaned her.

3. On November 1, he transferred to Mrs. Quin five shares of Consolidated Gas stock because she had lost $500 in a "concern."

4. On November 14, he transferred his savings account in the Calvert Bank to the names of himself and Margaret A. Reil in the usual form of deposit so that the title vested in the survivor on the death of either.

5. On December 1, he transferred to Margaret A. Reil all of his ground rents by deed, reserving a life estate.

6. On December 23, Mrs. Coxon paid her debt with interest, amounting to $2,100, by check. This check was payable to George H. Wempe, was endorsed by him and then by Margaret A. Reil, and by her deposited in the savings account in the Calvert Bank on the same day.

7. On January 10, 1923, he took Margaret A. Reil to the Safe Deposit Company's office and had her name put on the books so that she could have access to his safe deposit box, and introduced her to the vault custodian.

8. On January 16, Margaret A. Reil took two certificates of Consolidated Gas stock of 5 shares each which had been duly endorsed by Wempe, to the office of that company and had them transferred—one to the name of Lawrence Reil, her brother, and one to the name of Catherine Barry, her sister. She then put these new certificates in the Safe Deposit box.

9. On January 20, he assigned a $1,000 note payable by Adam Bittner and wife, to Margaret A. Reil.

10. On March 12, Margaret A. Reil took the two certificates of Gas stock from the Safe Deposit box for the purpose of delivering them to Lawrence and Catherine, but it does not appear from the evidence whether the delivery was made on that day or after Wempe's death, which occurred the next morning.

On March 13, the life estate reserved in the ground rents expired with him. It thus appears that during his lifetime and during a period when his health was steadily retrograding, he stripped himself by these transfers of all his property.

His relatives with his brother and sister were friendly from the time of the reconciliation in Mr. Benzinger's

office up to the time of his death. They exchanged occasional visits, but it is noticeable that after September, 1922, when Dr. Heck informed him of his condition, his brother and sister did not see him alone, that is, out of the actual or nearby presence of a member of the Reil family—with one exception, and that was when he went to see Mrs. Coxon, his sister, at Overlea in October (p. 184) and asked her to pay the loan of $1,900.

After September, 1922, when George went to Harford County to see his brother Robert he was always accompanied by one of the Reil family; and when Robert visited him at Mrs. Quin's, some member of that family was always present; and so it was when Mrs. Coxon, his sister, went to see him at Mrs. Quin's house (p. 173 and 185). Likewise when Officer Bitner upon request went to see Wempe about four weeks before his death, Wempe told him: "I don't want you to pay anyone at all. He said I don't want you to pay that to anybody at all but Miss Margaret Reil and she was standing there." (p. 137). Wempe was referring to payment of the $1,000 note above mentioned.

Mrs. Thalheimer was an old friend of his—he often visited her and her husband up to about two and a half years before his death, at which time his visits ceased and this point of time corresponds with the time he went to live with Mrs. Quin. Mrs. Thalheimer testified about her visit to Mrs. Quin's in January, 1923, to see him. According to her statement she was denied access to him, although she waited at the house for about a half hour for him to wake up but was finally told by Mrs. Quin that "Mother says you cannot see him." And this testimony is not denied.

A significant set of facts in this case is the following:

Mr. Benzinger had been counsel for the Wempe family for years; he knew them well and he was not acquainted with the Reil family. When George Wempe wished to transfer the ground rents to Margaret he went to see Mr. Benzinger about it. Mr. Benzinger advised him against the transfer and told him to go home and think it over. He did not tell Mr. Benzinger of the other transfers he had made nor did he tell him that he contemplated making those that were made after the execution of the deed of the ground rents. He returned to Mr. Benzinger's office and executed the deed on December 1. Now, according to the testimony of the defendants, there was considerable apprehension on the part of Wempe and of members of the Reil family as to whether these transfers would withstand attack. Mr. Trageser was asked this question by several of the Reil family, although he does not say what he told them on this subject. Wempe made this inquiry of Charles Barry, Catherine's husband, which resulted in the letter from Charles to Wempe written about February 22, 1923, from Washington in which Charles endeavors to allay Wempe's fears lest these transfers might be overthrown. The letter is as follows:

Sunday Afternoon.

Dear Ginky:

I have talked over the matter of the transfer of those ground rents with several responsible persons and they all agree it would be a very difficult matter for anyone to prove insanity, or to prove that undue influence was brought upon you to bring about such a transfer or gift. In getting the opinions of these various persons I stated the facts (not mentioning any names) and was told that undue influence did not exist (by all of them), that is, that no influence was brought to make you do as you did.

Now, Ginky, if you have been worrying over things not turning out as you expected them to, I hope that this letter will relieve your mind and that you will stop worrying immediately. To tell you the truth, I don't think there is a chance of things not working out as you intend. * * *

Charles.

Mr. Trageser was a friend of the Reil family, but not a practitioner, though he has been admitted to the Bar. Mr. Barry is also a lawyer but not a practitioner and the Washington lawyers consulted by him, as stated in the letter, are not named. The language of this letter shows plainly that members of the Reil household, including Wempe, were discussing insanity and undue influence in relation to these very transfers all of which had been made at the time this letter

was written except the delivery of the stock certificates which occurred on or after March 12.

Now if these transfers were made by Wempe in the exercise of his own free will then the letter should have allayed his apprehension, if he had any, and he should have been pleased when he read it, but quite the contrary, Mrs. Quin testified (p. 254). "I gave him the letter and he said, 'open it for me' and I opened it and I had to give him his glasses to read it and he cried when he got through the letter."

But the outstanding fact in all this is that Mr. Benzinger, who had been Wempe's attorney for years, was not the one who was consulted. Could this have been because Mr. Benzinger advised Wempe against making the deed of the ground rents on December 1?

Several disinterested witnesses produced by defendants testified to statements made in varying forms by Wempe to the effect that he wished his property to go to the Reil family or to Margaret and these statements were all made out of the presence of that family. Of these witnesses the testimony of Mr. Benzinger and Mr. Hemsley is the most impressive.

None of the statements of Wempe give a satisfactory explanation of why he should strip himself of all his property while still alive and thus disinherit his next of kin in favor of the Reil family. He harks back in these statements to the service of Catherine in dressing the wound left by the carbuncle, and to a difficulty with his family of long standing and of their attitude towards him (p. 20). For this service he gave her $50 in gold and a diamond ring and the evidence shows very friendly relations with his family up to the time of his death. The nursing in his last illness did not begin until January 13, 1923, when he took to his bed, whereas nearly all of these declarations were made before January 13, 1923, and were not made in contemplation of those services which he was to receive after these declarations had been made. Furthermore, according to defendant's testimony, it was Wempe's intention to intrust all of his property to Margaret A. Reil for distribution among the children and grandchildren of Mrs. Reil, and Mrs. Reil herself is to receive none of it (p. 212). The services and attentions he received from the Reil family fall very far short of being the equivalent of $12,000. Furthermore, undue influence may continue to operate out of the presence of the person exercising it. Davis vs. Calvert, 5 G. & J. 303. Nor is it inconsistent with the exercise of undue influence or artifice that the instrument assailed was executed voluntarily and with a knowledge of its contents. Bentley vs. Bentley, 141 Md. 438.

The legal principle governing undue influence cases is the same whether the instrument attacked is a will or an assignment *inter vivos* but there is one marked distinction between the two classes of cases. In will cases the burden of proof never shifts to defendants whereas in case of gifts *inter vivos* where the evidence shows a state of confidential relations existing between donor and donee the burden is cast upon the defendant to rebut the presumption of undue influence. This distinction is important and is well pointed out in Diffenderfer vs. Griffith, 50th Md. 483-4. The Court states: "In cases of gifts or other transactions *inter vivos*, it is considered by Courts of Equity, that the natural influence which such relations as those in questions involve, exerted by those who possess it, to obtain a benefit for themselves, is an *undue* influence. The law regarding wills is very different from this."

The intimate association existing between Wempe and the Reil family for the last two years of his life under the circumstances developed in the evidence makes out a relation of confidence between these parties. "In such a case it is not necessary to prove actual undue influence. The law presumes it, and casts the burden upon the recipient of a gift under such conditions to prove not only that it was the voluntary act of the donor uninfluenced by the donee, but also that he had the benefit of competent advice and understood what he was doing."

Coburn vs. Schilling, 138 Md. 199.

This burden I think the defendants in this case have failed to meet.

After the trial had been closed and the case was being held *sub curia*

counsel for complainants were permitted to recall the witness Trageser. After considerable examination and cross-examination he was permitted over objection to state that about a week after Wempe's death Mrs. Annie Reil stated to him in the presence of Charles Barry on an Ellicott City car that about three days before Wempe's death, after a visit from his brother Robert, Mrs. Reil and Mrs. Quin went to his room and found Wempe crying and he said that he had made a mistake and that he ought to have left his property to his people.

The objection raised was that the admission of this testimony was an infraction of the privilege of clients (p. 486), in as much as Mr. Trageser had been consulted by Mrs. Annie Reil, Margaret Reil, Lawrence Reil, Charles Barry and Mrs. Quin (p. 478).

Whether there was any undue influence practiced upon Wempe or not, there was a combination among Mrs. Annie Reil and her son and her son-in-law Charles Barry and her three daughters to divide the property among Mrs. Reil's children after it had been received by Margaret and after Wempe's death, and Trageser says (p. 462), that he was to transfer the property to the various ones who were to get it. The combination was still in existence at the time the statement is alleged to have been made, for this division had not been completed. If undue influence had been used upon Wempe we have that sort of a combination in which a statement made by any one of these parties would be evidence against all of them if made during the progress of the combination.

Mr. Trageser was a friend of the family and a frequent visitor at the Reil house. He "knew the whole case." He had been admitted to the Bar but was not a practitioner. He was not retained in the ordinary sense for compensation. He made no charge (p. 461). What they wanted to know from him was whether or not the deed was "legal and effectual" (pp. 479 and 482). With regard to the transfer of the $1,000 note he has this to say (p. 464): "This was a $1,000 note that she came to see me about and she told me that Mr. Wempe wanted to give it to her and she asked me how was the best way to have it transferred to her so

that there would not be any question about it after his death."

When we take these statements of Trageser in connection with the letter Charles Barry wrote to Wempe we see plainly that these people were taking advice as to whether these transfers were proof against a suit to invalidate them and that they were talking this advice while these transfers were being obtained, that is, between November 1, 1922 and March 12, 1923.

Now it is said in Davis vs. Calvert, 5 G. & J. 301-2, that fraud is a distinct head of objection from importunity and undue influence; nevertheless the same principle running through the books of authority is applied to both classes of cases.

See also 29 A. & E. Encyclopedia 106.

This being so where a lawyer is consulted for the purpose of promoting a scheme for obtaining property by undue influence what transpires between lawyer and client is no more privileged than it would be if the scheme were to obtain the property by a fraud. Both methods are equally illegal.

The fact that Mr. Trageser was not a party to this scheme makes no difference. The following authorities declare against the existence of privilege in such cases where fraud is the means used and by analogy they ought to apply also to cases where the means is undue influence.

Williams vs. Zuebrada Rail Co., 2 Chancery (1895), p. 751.

Beer's Stephen's Digest of Evidence, Art. 115.

In re Posthethwaite, 35 Chancery Division 722.

3 Russell on Crimes, 2332, Canadian Edition.

Bullivant vs. Atty. Gen'l of New South Wales, appealed cases (1901), p. 196.

In this connection the case of Queen vs. Cox and Railton, 14 Q. B. D. 164, should be read: The defendants were charged with conspiracy to defraud. The advise sought by defendants from their solicitor will be found to be very similar to the advice sought by the defendants in this case from Mr. Trageser. It was held that there was no privilege.

For the foregoing reasons the relief prayed in the bill of complaint or so much thereof as may be necessary will be granted.