ALFRED G. SCHMIDT et al. *v.* MARIE AGNES
JOHNSTON et al.
[No. 82, October Term, 1930.]

*Decided January 15th, 1931.*

The cause was argued before Bond, C. J., Pattison,
Urner, Adkins, Offutt, Parke, and Sloan, JJ.

*David Ash* and *James J. McNamara,* for the appellants.

*J. Cookman Boyd* and *J. Cookman Boyd, Jr.,* for the
appellees.

Pattison, J., delivered the opinion of the Court.

On the 7th day of December, 1916, Catharine Schmidt
and John Schmidt, mother and father of the appellants Al-
bert G. Schmidt and Luther Edward Schmidt, and the appel-
lees, Marie Agnes Johnston and Walter L. Schmidt, con-

veyed unto their daughter, then Marie Agnes Schmidt, three lots or parcels of ground in the City of Baltimore, she to have and to hold the same in trust for her mother, the latter to be permitted to use and enjoy said granted property and to receive the rents, income, and profits therefrom for the term of her natural life, with power to dispose of said property by a deed, will, or otherwise, and, in case of sale, to appropriate the proceeds thereof to her own use, and from and after her death the said lots or parcels of land, or so much thereof as remained undisposed of at that time, was to become the property of all the children of the grantors living at the time of the execution of the conveyance, as tenants in common.

On the 30th day of January, 1924, Catharine Schmidt executed her last will and testament, by which she bequeathed to her sons, Luther Edward, Water L., and Albert G. Schmidt each the sum of $500. The rest and residue of her estate she disposed of as follows: "I give, devise and bequeath the rest, residue and remainder of my estate * * * of which I may die seized and possessed unto my daughter, Marie Agnes Schmidt, for and during the term of her natural life, with full power and authority * * * to sell * * * convey or otherwise dispose of all, or any portion of said property and estate and appropriate the proceeds of such sale to her own use and from and immediately after the death of my said daughter * * * I give, devise and bequeath one-third of said residue of my estate unto each of my three sons * * * their heirs, personal representatives and assigns equally, share and share alike." And by her will she appointed her daughter, Marie Agnes Smith, the executrix thereof.

Catharine Schmidt died on February 5th, 1924, after the death of her husband, and after having disposed of one of the three parcels of land described in the deed of December 7th, 1916, leaving two of the said lots or parcels of land undisposed of, and leaving surviving her all of her said four children.

On June 21st, 1924, the three sons executed unto their sister, Marie Agnes Schmidt, a deed conveying a life in-

terest in the two lots of land conveyed by the deed of December 7th, 1916, which remained undisposed of at the time of the death of the mother. This deed recited the deed of December 7th, 1916, and referred to the provisions therein contained that all the property undisposed of by her was to go alike to her four children, and stating therein that two of said lots were undisposed of at the time of the mother's death. It also recited the fact that the mother had executed her last will and testament disposing of her property as above mentioned. It was then stated in the deed that "it was the evident intention of said testatrix that said Marie Agnes Schmidt should take a life estate in the property mentioned and described in said deed of trust, as well as the other property of said testatrix, but some doubt has arisen whether, under the true construction of said will, the said Marie Agnes Schmidt took an estate for life in the property described in said deed of trust," and "for the purpose of carrying out the intention of said testatrix and vesting a life estate in the shares of" the sons "in said lots of ground mentioned and described in said deed of trust," the deed was executed, in which the clause appeared: "That for and in consideration of the premises and the sum of one dollar, and of natural love and affection which said parties of the first part (the brothers) bear toward said party of the second part (their sister) the said Luther Edward Schmidt (Alfred G. Schmidt and Walter L. Schmidt) do grant unto said Marie Agnes Schmidt for and during the term of her natural life, and no longer, all those two lots or parcels of ground mentioned and described in the deed of trust * * * but with no power of sale of said lots in said grantee, said lots of ground after the death of the said Marie Agnes Schmidt to revert to said grantors in accordance with the terms of said deed of trust." Then follows in the deed a release whereby the sister, her personal representatives or assigns, are released from all claim and demand for and on account of all of said legacies paid by her to the grantors.

On the same day as the execution of the last-named deed, Marie Agnes Schmidt executed a deed to them containing

recitals like those in the deed to her from her brothers, whereby she granted and conveyed to her brothers all her estate in remainder in and to said lots or parcels of ground, subject to her life estate therein which was reserved by her.

On the 16th day of July, 1929, the appellants Alfred G. Schmidt and Luther Edward Schmidt, with their respective wives, filed a bill against Marie Agnes Johnston and their brother, Walter L. Schmidt, in which the facts above stated were alleged, and in addition thereto it was alleged that it was represented unto them, the appellants, "by the defendant and by her duly constituted agent and attorney * * * that it was the intention of the said Catharine Schmidt, according to the provisions of her said alleged last will and testament, that said Marie Agnes Schmidt should take a life estate in the property mentioned and described in said deed of trust, as well as the property which said testatrix absolutely owned at the time of her death," and that it was necessary for them to execute a deed to their sister "in order to carry out the intention of said testatrix and vest a life estate in said property under said deed of trust" in her, and, "relying upon the truth of these representations so made to them," a deed was caused to be prepared by the defendant, which was on the 21st day of June, 1924, executed by them, together with their brother, Walter L. Schmidt, their respective wives not joining in the deed, whereby they conveyed to their sister, Marie Agnes Schmidt, now Johnston, a life interest in said two parcels of ground, named and described in said deed, with the improvements thereon. That it was not until the 15th day of March, 1929, that the appellants discovered and were advised that said representations so made to them, and the recitals thereof in the deed, were "untrue and false in fact."

The bill further alleged that the sister, "Marie Agnes Johnston, was, at the time of the death of the said Catharine Schmidt on February 5, 1924, about forty-five years of age and unmarried, and that prior to the execution of said deed on June 21, 1924, she represented unto" the appellants, "that she never intended to marry, that she could not go out

and earn a living, and that all the money and property which she had received from her mother and from her mother's estate, consisted only of two houses in fee, one on Vine Street, and one on Conway Street * * * in Baltimore City, and the sum of $290.94, in cash, and that after the payment of the three legacies of $500.00 to each" of the appellants and Walter Schmidt, "according to the provisions of said alleged will of Catharine Schmidt, deceased, it would be impossible for her to exist upon the income from said property, unless they would carry out the intention of the mother as expressed in said will and execute said deed, and these representations were also a consideration" to the appellants "in the execution of the deed of June 21, 1924, as they believed said representations to be true, and would not have executed said deed except for said representations and their belief in the truthfulness thereof, and yet in November, 1926, they ascertained that said representations so made to them * * * were wholly false and untrue and were made by their sister to willfully and intentionally deceive them in order to procure from them the execution and delivery of said deed, for she had received from her mother before her death, the sum of $9,103.40, in cash, which she claimed as belonging to her; that she also upon the death of her mother claimed the absolue ownership of the property of her mother known as 714 N. Appleton Avenue, Baltimore, worth approximately $4,500, and that in addition thereto she did actually marry in September, 1926." That the two aforesaid properties have been in the possession of Marie Agnes Schmidt since the death of her mother in February, 1924, and she has been collecting and converting to her own use all rents, income, and revenue therefrom, "averaging $1,250 a year, less taxes, water rent, and insurance thereon." It is then alleged in the bill that the deeds of June 21st, 1924, "should be declared illegal and void." The bill then concludes with the prayers, first, that said deeds be rescinded and declared illegal and void; and, second, that Marie Agnes Johnston be compelled to account with the plaintiffs for their share or portion of all rents, in-

come, and revenue from said property which have come into her hands since the death of their mother on February 5th, 1924.

An answer was filed by the appellee Walter L. Schmidt, a brother, in which he averred that, at the time of the execution of the deed to said Marie Agnes Schmidt, dated June 21st, 1924, he fully understood the terms, provisions, and meaning of said deed. The appellee, Marie Agnes Johnston, in her answer, denied the alleged misrepresentations containd in the bill, which, as alleged therein, induced the appellants to execute the deed to her of June 21st, 1924, and which, by the prayer of their bill, they asked to be set aside and annulled.

The appellant Luther Edward Schmidt, a witness called by the plaintiffs, was handed a copy of the deed executed by him and his brothers, dated the 21st day of June, 1924, and was asked if he, at the time of the signing of the deed, knew its contents, and his reply was "no." He was then asked to tell the circumstances under which he signed it. He said he was asked by Mr. Budnitz to come to his office, which he did, and when there "he told me he wanted to talk over something about some papers he had drawn up, and it had been so long ago they had slipped his mind, and when he told me that, I said, I won't sign any papers if some one comes in and gets what I should get, and he said, 'Agnes is not that kind of a girl, she wants to do the right thing.' So I thought everything was all right, and we met there a couple of mornings after, my two brothers and sister and myself * * * that is when he said about these papers that he had overlooked, and said it was my mother's intention according to the will that my sister should have the power over these properties the same as she got under the will, and my brother Alfred said, 'You would not have to have it willed, the will would not have been necessary,' so we all agreed, because my sister, she was unprotected and we did not know how she was going to get along", and we agreed that she "should have the interest. We did not know what she was getting. * * * We did not know anything about the will or contents, or anything

how the property was fixed, and of course we thought we were following out my mother's wishes and we did not know whether my mother left $50.00, or whether she left $50,-000.00."

This statement that he did not know anything about the will, or its contents, was made notwithstanding the fact that he had previously testified that the will was read to them by Alfred in the kitchen of his mother's home on the day following her death. He signed the deed, as he testified, without it being read to, or by him, though he admitted he could read. That, at the time of signing the deed, he received the legacy of $500 bequeathed to him by his mother, and for which he signed the release contained in the deed. Witness further testified that, when he signed the deed, his brothers were not present, and at that time he did not see Mr. Yost, before whom the deed appears to have been acknowledged. This was the extent of Edward's testimony as to the misrepresentations made by Mr. Budnitz, and nothing was said by him as to any misrepresentations made by his sister, except "she said she did not intend to marry," but this he said "did not have anything to do with it."

The appellant Alfred G. Schmidt testified: "That he, after the death of his mother, met his brothers at the office of Mr. Budnitz, and there Mr. Budnitz explained why he had requested them to call at his office, "and went on to say that there were several pieces of property that he had overlooked and he said while he drew up the paper some years back, and having so many other things on his mind, he had overlooked it. He said, according to your mother's will, it was her intention for your sister to have the same interest in these properties (meaning those described in the deed of December 7, 1916) as she has got under the will, and he further stated, but if you boys want your share, or demand it, you can have it. "Q. What else did he say? A. That was all right on that point. We were only in the office about ten minutes. We relied on the truth of what Mr. Budnitz was telling us and we agreed to let our sister have it. Q. And because of that decision, what did Mr. Budnitz say he would

do, if anything? A. He said, 'Agnes, your brothers have acted very nice in the matter', and he said, 'I will go ahead and prepare the paper' ", and "we could call back in the next two or three days and sign it and get our money." Q. Is that all that was said by Mr. Budnitz to you and your brothers on that occasion? A. That is all I can recall. Q. State whether or not your sister, Marie Agnes, said anything to you? A. Did not utter a word, absolutely silent. Q. How many days after that conversation was it that you called at Mr. Budnitz' office? A. About three days. I signed my name and received my check for $500."

He could not recall any one else being present at that time. He further testified that the deed was not read to him before he signed it. At the time he signed the deed, he had no definite knowledge as to the amount his sister would receive under the will of her mother, but thought that all his mother left passed under her will to his sister. Nor had he any definite knowledge as to what his mother had in bank or in the building association. She "could have sold all of her property and I would not have known it." On cross-examination the witness admitted that, at the trial of the caveat, which he and his brother filed against his mother's will, he testified that he heard the rumor of his sister's proposed marriage in 1926, that he prayed for it to happen, because, as he thought, it would give him legal grounds: "I thought it was legal grounds. I would pray for anything else that would give me legal status in court." Upon redirect examination he was asked by his counsel: "In answer to Mr. Boyd's question, you started to say 'I would not have signed that paper,' but Mr. Boyd interrupted you at that point, what did you want to say? A. What I was going to say, if Mr. Budnitz or my sister had made known to us or me personally the facts I learned in the fall of 1926, I would not have signed any paper. Q. Why? A. What I discovered in 1926, was that my sister was getting outright around $9,000. Q. In cash? A. Yes, the money in bank, or wherever it was, and then that my mother's home was put unbeknownst or secretly in joint names to go to her. She claimed it as hers outright, and I

would not have jeopardized my quarter interest in the estate at the expense, say, not alone of myself but my wife."

Mr. Budnitz testified that he prepared for Mrs. Catharine Schmidt, a few days before her death, the will which was executed by her in February, 1924. He had also drawn for her a will, which she executed in 1921, by which she gave to each of her sons, as a legacy, the sum of $50. The necessity for the new will arose solely from the fact that she wished to increase the amount of $50, given to each of them by the former will, to the sum of $500. Upon the death of Mrs. Schmidt, he was employed as counsel by Miss Agnes Schmidt, who was named as executrix in the will of her mother. In the course of the settlement of the estate, he asked Miss Schmidt to bring to him the deeds in her possession, and, when he received them, he was surprised to find the deed executed on December 7th, 1916, the deed of trust spoken of in this case, and, though this deed was prepared by him, he had not, until it was produced, the slightest recollection of it. There were four pieces of fee simple property that Mrs. Schmidt owned at the time of her death, two of these were in the deed of December 7th, 1916. "I saw at once that there was some difference between the estate which the children took under this deed of trust and the estate they took under the will. * * * At the time of the preparation of the will I did not have any recollection of this deed of trust, that is the mistake Alfred Schmidt refers to * * * of course, it was no mistake. * * * And I told her (Miss Schmidt) I would like to have a talk to her three brothers and explain that to them. * * * They came down and I explained to them the circumstances of this deed of trust, as Mr. Alfred Schmidt has testified. * * * I was proceeding upon the legal assumption that the will that Mrs. Schmidt executed did not purport to be carrying out the power in the deed of trust. * * * In as much as the will itself did not refer to the power or to the property, I assumed that the deed of trust prevailed and that they were entitled to the two pieces of property as tenants in common, and I told them they were entitled to that in equal shares, but I said to them, I have no doubt but what

your mother intended that your sister should also have a life estate in this property and that after her death it should go to the three boys, and I said, if they were willing, I would prepare a deed to carry out that intention. They acquiesced, but one of them, I don't know whether it was Edward or Alfred, spoke up and said that under the will she had a right to sell the property, but if they turned this property over to her they did not want her to have the right to sell it, and they said they wanted that put in the deed." He further testified that, by a deed simultaneously executed, she conveyed her interest in these two lots of ground, subject to her life estate, to her three brothers, by which "she divested herself of her one quarter interest in those two houses. Q. At the time of the execution of this deed from the three brothers to the sister, do you know whether or not that deed was read by the brothers? A. I am quite sure that the deed was read by me to them and the legal import of the deed was fully explained, and I am quite sure Mr. Yost was present. He was a notary public and * * * at that time in my office," and he took the acknowledgments of the grantors to said deed. He was then asked if he concealed any matter of interest in connection with this property from the brothers at the time of the execution of this deed, or prior to that? His answer was: "I did not. * * * I explained as far as I was able * * * the situation with reference to the circumstances of the deed of trust and * * * how they could give their sister the life estate * *.* in the two houses * * * and they acquiesced at once. There could be no mistake about their understanding it. Q. Was there or not anything said about the sister remaining single at any one of these conversations? A. The question of the marriage of Miss Schmidt was never spoken of by me or to me by either Miss Schmidt, or Mrs. Schmidt, or any of the brothers. Not until after the marriage took place was there anything said about it. Then the controversy began actively."

John N. Yost, a member of the bar, testified that he was with Mr. Budnitz from 1919 to 1929, and was a notary public in 1924, that he saw the appellants and their brother

Walter sign the deed of June 21st, 1924, and he took their acknowledgments of it. When asked if he knew whether or not the deed was read to them, he said: "My recollection is very clear that Mr. Budnitz read the deed to them before they signed it, and called special attention to the one clause with the reference to that power of sale. * * * All three brothers were present at the time."

The effect of the deeds of June 21st, 1924, one from the brothers to the sister, and the other from her to them, was to vest in her a life estate after the death of the mother, in the property mentioned and described in the deed to her of the 7th day of December, 1916, and to divest her of the share in fee simple in said property after the death of the mother, which was conveyed to her by said deed of December 7th, 1916. In both deeds, it was expressly agreed that the appellee was not authorized and empowered to sell and dispose of the property therein described, as provided in the will of her mother. The practical effect of these deeds being that the appellee was granted by her brothers a life estate in said two pieces of property in lieu of a one-fourth fee simple interest therein, which, under the deed of December 7th, 1916, was to pass to her upon the death of her mother, and it is to that extent only that the appellants are affected by the deeds that they are asking to be set aside.

These deeds were asked to be set aside because of the alleged misrepresentations of the appellee, Marie Agnes Johnston, and her counsel, Mr. Budnitz, made before or at the time of their execution. We have set out very fully the alleged misrepresentations, both those of the appellee, the sister, and her attorney, Mr. Budnitz.

So far as the evidence discloses, no misrepresentations whatever were made by the appellee, Mrs. Johnston. Neither Edward nor Alfred testified that she said anything to induce them to execute the deed to her, although they allege in their bill with apparent recklessness that misrepresentations were made by her both as to the effect of the will and as to her subsequent marriage, which induced them to sign the deed. It is, therefore, upon the alleged misrepresentations of Mr.

Budnitz alone that the relief sought must be granted, if granted at all, and what were the misrepresentations made by him? Both Edward and Alfred testified, in substance, that he told them that, when the will was prepared, he overlooked the deed of December 7th, 1916, prepared by him about eight years before, and, because of that fact, no reference was made to the pieces of property therein described, or to the power reserved by the grantors therein, which he regarded as essential to bring the disposition of the properties within the provisions of the will, and they were told by him that, under the deed, no life estate was vested in the sister, and, if they so demanded, the provisions of the deed must be carried out, by which a one-fourth fee simple interest in said properties passed to each of them upon the death of the mother. They also testified that Mr. Budnitz told them that, according to the will of their mother, it was her intention that their sister was to have a life estate in all her property, and, being so told, they agreed to execute the deed conveying to her a life estate in the unsold properties described in the deed. The statement that they were told that such intention of the testatrix was in accordance with the will is in direct conflict with what they had previously said was told to them by Mr. Budnitz, that the provisions of the will did not apply to these properties, and, if they demanded, they would take under the deed by which a share in fee simple passed to them after the death of their mother. The only representation shown to have been made by Mr. Budnitz was that, in his opinion, it was the intention of the mother that the daughter should have a life estate in all her property, including that embraced in the deed, not that the will so provided, for the appellants were expressly told it did not. This opinion of Mr. Budnitz was acquired, no doubt, from what was told to him by the testatrix, when he was employed to prepare her will, and, from what he says, no provision was inserted therein which, in his opinion, would apply to the properties described in the deed of December 7th, 1916, because of his having overlooked the existence of said deed.

It is not shown that the representation made by him was false or untrue, or that they were wrongfully induced to sign the deed because of such representation. They were fully told of their rights under the deed, and what was done by them was done of their own free will. The relief here sought was not asked for until a long while after the execution of the deed and their discovery, as they claim, of the alleged misrepresentations of Mr. Budnitz. Their dissatisfaction arose, it seems, upon learning of the marriage or proposed marriage of their sister, which evidently was not contemplated by them at the time of the execution of the deed, and in consequence of which a part or the whole of the property left to her by her mother might thereby be lost to them. It was this, and the further discovery as to the amount received by their sister from her mother, that caused the trouble between them, for Alfred admitted in his testimony that he would not have signed the deed had he known the amount his sister received from her mother, which was much greater than he thought, and which he did not discover until 1926.

The conclusion which we have here reached is made after a full consideration of the rule applying to cases where a relation of confidence exists between the parties. *Zimmerman v. Bilner,* 79 Md. 125, 28 A. 820; *Henry v. Leech,* 123 Md. 439, 91 A. 694, and the cases there cited.

As we find no error in the court's action in passing the decree appealed from, the decree will be affirmed.

*Decree affirmed, with costs.*